UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
UNITED STATES of AMERICA,

-Against-

ANDREW BARTOK, **S4 10 Cr. 510 (CS)**

Defendant.
-----------------------------------x

**DEFENDANT ANDREW BARTOK'S RULE 33 MOTION**

DAWN M. FLORIO LAW FIRM PLLC
Attorney for Defendant
3604 Broadway
New York, New York 10031

Dawn M. Florio, Esq.

## PRELIMINARY STATEMENT

This motion is made pursuant to Rule 33 of the Federal Rules of Criminal Procedure (hereinafter "Rule 33"), to request a new trial in the interest of justice and based on the insufficiency of the evidence in the above captioned case. Defendant Andrew Bartok requests that this Honorable Court review the verdicts, the summations and the credibility of the Government's witnesses to grant the herein Motion for a new trial.

## I. The Standard for Rule 33 Motions

The trial court has "broad discretion" to grant a new trial under Rule 33 if for any reason it concludes that the trial has resulted in a miscarriage of justice. United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992).[1]

The Court should grant a new trial where it would constitute a manifest injustice to allow the verdict to stand. Id. at 1414. In the instant case, the interests of

[1] Because Rule 33 vests broad discretion in the district court, a decision to grant (or deny) a Rule 33 motion is reviewed on appeal only for "abuse of discretion." United States v. Ferguson, 246 F.3d 129, 133 (2d Cir. 2001).

justice require a new trial because the verdict was against the weight of the prosecution's evidence.

The Court has broad discretion when determining a Rule 33 Motion. On a Rule 33 Motion, this honorable Court need not view evidence in light most favorable to the Government. It may weigh the evidence and consider the credibility of witnesses. United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir.1992).

The Court may grant a new trial when "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred." U.S. v. Thomas, 894 F.Supp. 58 (N.D.N.Y. 1995); United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir.1980).

## II. Motion to Set Aside The Verdict on Insufficiency of the Evidence Grounds

Andrew Bartok's trial commenced on October 4, 2012. The Government presented volumes of documentary evidence consisting of bankruptcy filings, court notices and letters

addressed to bankruptcy petitioners/Revelations customers regarding 341 meetings, bankruptcy court orders adressed to Revelations' employees and like records.

Notably, the Government failed to present any direct evidence of Andrew Bartok's intent to defraud customers. Each witness who testified against Andrew Bartok failed to tell this Court how Mr. Bartok engaged in activities with the specific intent to hurt or defraud others.

Lastly, each witness testified that Revelations' customers stayed in their homes for extended periods as a result of Revelations' services. After each witness failed to pay their monthly mortgage payments and received subsequent eviction notices, they sought Andrew Bartok's help. Customers started talking about the successful delays of their foreclosures. These witnesses sought a way to stay in their homes and needed to delay their foreclosures. Andrew Bartok and Revelations Consulting provided the customers with tools to do just this.

Customers sought, contracted and paid for Revelations' services, and these same services were the subject of the Government's prosecution in Indictment S4 10 Cr. 510.

### A. Witness Testimony Did Not Support a Finding That The Defendant Had The Requisite Intent to Be Criminally Liable in The Instant Case Nor Did Testimony Support a Finding That the Defendant Conspired to Defraud Others

Kathleen Addario and Veronica Tobin, Andrew Bartok's co-defendants in the instant matter, testified against Mr. Bartok. Nevertheless, Ms. Addario's and Ms. Tobin's testimonies revealed that Mr. Bartok lacked the requisite intent to make him criminally liable for the Government's charges in Indictment S4 10 Cr. 510. Ms. Tobin's and Ms. Addario's testimonies also failed to support a finding that Mr. Bartok conspired with Ms. Addario and Ms. Tobin to defraud others.

#### 1. Kathleen Addario

Ms. Addario testified against Mr. Bartok. Ms. Addario faced one hundred eighty-five years of incarceration (185) and began her proffer negotiations with the Government nearly two years before and in preparation for trial. Ms. Addario explained to the jury that Andrew Bartok had pieced

together a foreclosure delay process. Ms. Addario also revealed that she changed and sharpened this process throughout Ms. Addario's decade long year career at Revelations Consulting.

According to Ms. Addario, for ten years Ms. Addario followed Mr. Bartok's orders. She was a tail and Mr. Bartok was the dog. See Trial Transcript ("Trial Trans."), P.234:

> He said that the dog wags the tail, the tail doesn't wag the dog, and he's the one that set up how things should be done in the company and that the employees should follow it.

However, the jury later learned that situations change and indeed applied to the instant matter. Ms. Addario was not a tail, but rather the head of Aladdin Financial, a company that applied the same methods that Ms. Addario had developed over the years at Revelations Consulting. See Trial Trans., P.377:

> Q. And when you left Revelations, how many clients did you take with you to Aladdin that had been Revelations clients?
>
> A. I didn't take any with me to Aladdin. The clients that decided to come was just about all the clients, about a hundred

clients that came over, just about every client originally came

See Trial Trans., P.378:

Q. Are you actually making a distinction between taking clients or inviting clients and they deciding to come with you, is that different for you?
A. Yes.
Q. What's the difference?
A. The difference is that I left and I told the clients if they wanted, to come with me. The difference to me is I gave the clients the choice to choose if they wanted to come with me or stay with Revelations. It was never just come with me,

Ms. Addario held such a pronounced and lead role at Revelations that one hundred (100) Revelations customers followed her to a new company, Aladdin Financial, which Ms. Addario created. Correspondingly, Ms. Addario helped lead the Government's prosecution of Andrew Bartok with her testimony.

When testifying about underlying acts of the conspiracy charged in the Indictment, Ms. Addario told the jury that it was Mr. Bartok who engaged in and who instituted each alleged criminal act.

<u>See</u> <u>Trial Trans., P.251</u>:

A Every practice that we practiced in Revelations was what Andrew told us to do at the beginning and we followed out what Andrew said to do.

<u>See</u> <u>Trial Trans., P. 234</u>:

Q One of the names you mentioned was Andrew Bartok. Did you ever -- when, when you saw him sign other people's names, can you describe how he did it?
A He would look at their -- he would look at their signature and copy their signature.

<u>See</u> <u>Trial Trans., P.233 - 234</u>:

Q Did you ever hear Andrew Bartok say anything concerning what creditor should be listed on bankruptcy petitions?
A It was Andrew Bartok who decided to just put the mortgage company down. Andrew Bartok is the first person that was doing the bankruptcies and that was his way of, of doing the bankruptcy.

Remarkably, Ms. Addario neglected to include in her testimony any proffer that Andrew Bartok knew his actions were unlawful or that Mr. Bartok promoted and shared his foreclosure delay process in order to defraud others. Also, Ms. Addario did not explain how Mr. Bartok exhibited a

desire to conspire with her against others. While Ms. Addario repeatedly told jurors that Mr. Bartok violated bankruptcy laws, her testimony did not describe how Mr. Bartok exhibited knowledge of or purposeful disregard of criminal laws with respect to Revelations' activities.

Kate Addario's testimony showed this Court that she herself did not have the requisite intent to be found guilty of a conspiracy. Ms. Addario explained to the jury, "At first .. I believed that we were helping people and Andrew had been in it for himself so everything was within the law, otherwise how would he be able to do it for himself." See Trial Trans., P.435. Also that Andrew Bartok had "said, that we were sort of flying below radar, but everything was within the law." See Trial Trans., P.435.

Notably, Ms. Addario testified that Ms. Addario changed her mind about Revelations' business practices being lawful only after authorities had told Ms. Addario that Revelations' business practices were unlawful.

Finally, Ms. Addario ended her story with the most telling statements of her testimony. Ms. Addario informed

the Court that despite having developed and managed her own separate client-base in New York, Ms. Addario allowed Andrew Bartok to be liable for problems with her New York clients. See Trial Trans., P.388-389:

> Q. And you get this order to appear. Andrew says he'll take care of it, right?
> A. Correct.
> Q. And basically he was taking the weight for what happened with your case, your client, right?
> A. It was his client and it was his business by his own admission so he said he was going to handle it.
> Q. And Andrew writes a letter to the judge and he says this is my business and I will deal with this and we've seen some of those exhibits, correct?
> A. Correct.
> Q. And you let him do that and go in for you because you thought he would protect you and take care of you are, correct?
> A. Yes.
> Q. Now, I think that you told the government on a couple of different occasions that there were a few reasons why you didn't show up when a federal judge told you to show up. One is that you were just plain scared, right?
> A. Right.
> Q. At that point you figure you're scared, a federal judge comes in, you think the best thing to do is just ignore the situation, right?
> A. Yes.

> Q. And then you've told the government on several occasions that you figured Andrew taking care of it was going to cover you, right?
>
> A. I was hoping.

Kate Addario allowed Andrew Bartok to take responsibility for problems that her business practices created. Ms. Addario's testimony did not show that Andrew Bartok knew or consciously disregarded the fact that the Government would find Revelations' business activities unlawful.

**2. Veronica Tobin**

Veronica Tobin testified as a Government witness. The progression of Ms. Tobin's relationship and friendship with Mr. Bartok revealed Mr. Bartok's motivations behind his work at Revelations. While Andrew Bartok collected fees from his clients, he wanted to and did help hundreds of customers delay foreclosures, including Ms. Tobin. Some clients were provided services in exchange for fee based on a sliding scale. In Ms. Tobin's case, Mr. Bartok took significant steps to help her improve her financial status.

See Trial Trans., P.1202-1203:

A. When I was a customer of Revelations, my income was extremely limited. There were some days where I had to drive down to pick up paperwork, but I didn't have enough money to put gas in my car. So, he told me to go fill up, told me to go get gas and he'll reimburse me for my expenses for the trip down.
And then after my -- after a while I started to go down there and hang out because I felt very comfortable there with everything I was going through my own personal life.

After Revelations helped Ms. Tobin delay the foreclosure of her home, Ms. Tobin began working for Revelations and developed a trusting relationship with Mr. Bartok. Ms. Tobin began managing the office when Mr. Bartok was not present. See Trial Trans., P.1208:

Q. And you trusted Mr. Bartok a lot, correct?
A. Yes.
Q. And Mr. Bartok trusted you a lot, correct?
A. Yes.
Q. And, in fact, there did come a time that Mr. Bartok went into semi-retirement, correct?
A. He spoke of it.

According to Ms. Tobin, over the years, Ms. Tobin naturally learned about Revelations employees, Mr. Bartok

and their volatile relationships. Andrew Bartok and Kate Addario managed their clients separately. Mr. Bartok managed New Jersey clients. Ms. Addario managed New York clients.

<u>See</u> <u>Trial Trans., P.1183</u>:

Q. In fact, Kate's -- Katherine Addario's clients were from New York, correct? That's who she tried to cultivate, correct?
A. Yes.
Q. And you and Andrew tried to cultivate clients from New Jersey, correct?
A. Yes.

Ms. Tobin testified that Ms. Addario managed her clients with results in stark contrast with Mr. Bartok's clients and services. Ms. Tobin and a number of Government witnesses testified that they were injured by Ms. Addario's work.

<u>See</u> <u>Trial Trans., P.1213-1214</u>:

Q. Did you tell the government in one of your proffer sessions that Katherine Addario was the one who had problems with the clients and not Andrew Bartok? Did you tell the government that in one of your meetings, yes or no?
THE COURT: Why don't you ask whether that's true.
Q. Is that true?
THE COURT: And then, if you need to refer back to something the witness said previously, you can, but you need

to start with whether it's true.
A. It's true. Customers would call Kathleen Addario, and if there were any issues with the customer pertaining to any paperwork for any payments or anything pertaining with Revelations, it would go through her first and then Kathleen would make an inquiry to -- with Andrew.

Kate Addario drew a clear line between herself and Mr. Bartok. According to Ms. Tobin, Ms. Addario purposefully separated herself from Mr. Bartok and the rest of the office. See Trial Trans., P.1194-1195:

A. In the North Bergen office there was a lot of closed doors with Kathleen and Alex in Alex's office with the doors closed. There were several occasions where I've seen Kathleen's office -- Kathleen's door closed with customers in her office.

Ms. Tobin also testified that her intentions, like Mr. Bartok's intentions, were to help clients, not to defraud them. Ms. Tobin made clear that she and Mr. Bartok did not conspire to defraud and injure others.

See Trial Trans., P.1175:

Q. And you were loyal to Mr. Bartok, correct?
A. Yes.
Q. And Mr. Bartok was loyal to you, correct?
A. Yes.
Q. And you kept working together.
A. Yes.
Q. Because your purpose was to continue helping

people
stay in their homes, correct?
A. Yes.
Q. And that was the whole goal of Revelations, correct?
A. Yes.
Q. So that people who could not pay their mortgage payments could stay in their houses longer, correct?
A. Yes.

Ms. Tobin also explained to the Court that she and Mr. Bartok wrote motions for clients in attempts to save their homes. Here the Court could not have found that the parties intended and conspired to defraud others.

See Trial Trans., P.1195:

Q. And it was your purpose to do that because you wanted
the motions to win, correct, like you wanted to be successful on the motions.
A. Yes.
Q. To help the clients stay in their houses longer, correct?
A. Yes.

In fact, Ms. Tobin's testimony showed no intention on the part of Revelations to disregard laws. Andrew Bartok and Revelations employed methods that stretched federal bankruptcy codes, but Revelations employees viewed the methods as being lawful. Here, reasonable jurors could not have found that Andrew Bartok conspired with other Revelations employees to engage in criminal acts.

<u>See</u> <u>Trial Trans., P.1196</u>:

> Q. And did you think there was anything illegal about this
> durable power of attorneys when you were working with
> Revelations when you first had started?
> A. At that time, no, because I had to sign one myself.
> Q. And did you ever have discussions with Mr. Bartok about
> the durable power of attorney that he had his customers
> sign?
> A. No.

**III. Motion to Set Aside The Verdict on Grounds That Jury Charges Were Incomplete**

Defendant maintains that the jury charges in the instant matter were incomplete. First, this Court instructed the jury that 18 U.S.C. 1001(a) applied to Count Six of the Government's Indictment. Allegedly, Mr. Bartok concealed material facts from, and made material false statements to, a United States Bankruptcy Judge. 18 U.S.C. 1001(a) provides:

> (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—
>
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
>
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or

> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
>
> shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.

This Court provided the jury with a scope for Count Six by instructing the jury that it may find Mr. Bartok guilty of Count Six (6) if jurors believed that Mr. Bartok made or used a "false, fictitious, or fraudulent" statements, representations or writings within the jurisdiction of the United States Government.

Here, Mr. Bartok maintains that the Court should have instructed the jury that subsection (b) of 18 U.S.C. 1001 also applied to Count Six. Mr. Bartok provided services to clients through power of attorney forms. Through the forms, Mr. Bartok was made a party to the bankruptcy proceedings at issue. 18 U.S.C. 1001(b) provides:

> (b) Subsection (a) does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate in that proceeding.

While Mr. Bartok does not deny that he assisted clients in their foreclosure and bankruptcy cases, Mr. Bartok submits that 18 U.S.C. 1001(b) shields him from prosecution for statements, representations and/or writings submitted to judges or magistrates in proceedings.

**CONCLUSION**

This case is a product of the United States' collapse of the 2008 mortgage crisis and the United States court system's natural and protracted response to the collapse's impact. Millions of homeowners have and are facing foreclosure due to unsuitable loans presented to unassuming mortgagees by aggressive mortgagors. Defendant Andrew Bartok and Revelations Consulting *et al* provided homeowners with methods to delay foreclosures. The homeowners or customers in the instant matter willingly and knowingly employed Revelations' methods in order to save their homes.

The testimonies discussed above describe Andrew Bartok's intent to run a foreclosure delay business while helping others. The Government's Case-in-Chief did not establish Mr. Bartok's intent to defraud customers or courts, as highlighted above.

In sum, Mr. Bartok and Revelations Consulting responded to an unprecedented and exigent time when large banks foresaw a profitable opportunity and overshot their marketing and sales of unsuitable mortgages to millions of people. These mortgagees lived within the Southern District of New York and the rest of the country. The defendants in the instant case did not have intent to defraud or conspire against customers, but rather responded to a need to help others.

On the very day that the jury handed up its verdict for Indictment S4 10 Cr. 510, the United States Attorney released a forceful statement about the fraud perpetrated by the banks in the mortgage lending industry.

> Those mortgages were purchased by government-backed mortgage finance firms Fannie Mae and Freddie Mac, resulting in over $1 billion in losses for taxpayers and countless foreclosures, according to the complaint

> announced Wednesday by the U.S. Attorney for the Southern District of New York.
>
> "For the sixth time in less than 18 months, this office has been compelled to sue a major U.S. bank for reckless mortgage practices in the lead-up to the financial crisis," said U.S. Attorney Preet Bharara in a statement. "The fraudulent conduct alleged in today's complaint was spectacularly brazen in scope."[2]

**WHEREFORE**, Defendant Movant Andrew Bartok prays that this Honorable Court grant a new trial in this action. In light of the evidence before the Court, the guilty verdicts on Counts One through Seven are against the weight of the evidence and should not stand.

Dated: New York, New York
November 18, 2012

Respectfully submitted,

Dawn M. Florio /s
Dawn M. Florio, Esq.
DAWN M. FLORIO LAW FIRM PLLC
Attorney for Defendant

---

[2] October 24, 2012 Press Release, The United States Attorney's Office: Manhattan U.S. Attorney Sues Bank Of America For Over $1 Billion For Multi-Year Mortgage Fraud Against Government Sponsored Entities Fannie Mae And Freddie Mac, http://www.justice.gov/usao/nys/pressreleases/October12/BankofAmericanSuit.php.