UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x
                                                                         :
UNITED STATES OF AMERICA,                                                :
                                                                         :
                - v. -                                           :   S4 10 Cr. 510 (CS)
                                                                         :
ANDREW BARTOK                                                            :
    a/k/a "Drew Bartok,"                                                :
                                                                         :
                Defendant.                                       :
                                                                         :
------------------------------------------------------------------------ x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

                                      PREET BHARARA
                                      United States Attorney for the
                                      Southern District of New York
                                      One St. Andrew's Plaza
                                      New York, New York 10007

Jeffrey Alberts
John P. Collins, Jr.
Assistant United States Attorneys
      -Of Counsel-

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x
                                                                         :
UNITED STATES OF AMERICA,                                                :
                                                                         :
         - v. -                                                          :    S4 10 Cr. 510 (CS)
                                                                         :
ANDREW BARTOK                                                            :
     a/k/a "Drew Bartok,"                                                :
                                                                         :
                          Defendant.                                     :
                                                                         :
------------------------------------------------------------------------ x
```

## THE GOVERNMENT'S SENTENCING MEMORANDUM

The defendant is scheduled to be sentenced in this matter on May 29, 2013. The Government respectfully submits this memorandum in advance of the sentencing, and requests that the Court impose a sentence of 95 years' imprisonment – the applicable Guidelines range in this case, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.[1]

## BACKGROUND

**A.     The Indictment**

Indictment S4 10 Cr. 510 (CS) (the "Indictment") was filed on February 15, 2012, in ten counts, charging Bartok with participating in a conspiracy to commit mail and wire fraud, in violation of Title 18, United States Code Section 1349 (Count One); mail fraud, in violation of Title 18, United Code, Sections 1341 and 2 (Count Two); participating in a conspiracy to commit offenses against the United States, to wit violations of Title 18, United States Code, Sections 152(3), 152(5), 152(9), 157, 1505 and 1519, in violation of Title 18, United States Code, Section

---

[1] Bartok's total offense level is 43. With a Criminal History Category of III, the applicable Guidelines range would be life imprisonment. However, none of the counts of conviction have a statutory maximum term of life imprisonment. As a result, pursuant to U.S.S.G. Section 5G1.2(d), the Guidelines range is 95 years' imprisonment.

371 (Count Three); bankruptcy fraud, in violation of Title 18, United States Code, Sections 157 and 2 (Count Four); participating in a conspiracy to obstruct justice, in violation of Title 18, United States Code, Section 1512(k) (Count Five); making false statements to a United States Bankruptcy Judge, in violation of Title 18, United States Code, Section 1001 (Count Six); obstruction of justice, in violation of Title 18, United States Code, Sections 1519 and 2 (Count Seven); perjury, in violation of Title 18, United States Code, Section 1623 (Count Eight); obstruction of justice, in violation of Title 18, United States Code, Sections 1512(b)(1) (Count Nine); and contempt of court, in violation of Title 18, United States Code, Section 401(3) (Count Ten).

On April 5, 2012, the Court severed Counts Eight and Ten. These charges are still pending.

Trial commenced on October 3, 2012, and ended on October 24, 2012, when the jury found Bartok guilty of Counts One through Seven and not guilty of the obstruction of justice charge that was Count Nine of the Indictment (presented to jury as Count Eight of a redacted indictment).

**B.**     **The Government's Case**

The Government's evidence at trial demonstrated conclusively that Andrew Bartok and his co-conspirators perpetrated a decade-long scheme to defraud hundreds of homeowners who were on the verge of losing their homes in foreclosure. Bartok obtained millions of dollars from these homeowners by lying to them. Bartok's lies included falsely telling homeowners that he was a foreclosure expert and that he knew of methods that would enable them to buy their homes back at a foreclosure auction for a fraction of what they owed on their mortgage. Bartok also lied to the homeowners by telling them that his program did not involve bankruptcy. In fact, Bartok never saved the homes of any of his customers using his

3

methods. Bartok put the homeowners through bankruptcy, sometimes without even telling the homeowners that he was doing so.

Bartok and his co-conspirators would file bankruptcy petitions in the names of these homeowners by forging the homeowners' signatures and then fill the petitions with false information. They would not tell the homeowners that these petitions, which were filed under penalty of perjury, were filled with lies. In furtherance of this scheme, Bartok also lied to a United States Bankruptcy Judge, counseled a co-conspirator not to produce documents in response to a court order, and told his clients not to participate in mandatory bankruptcy proceedings.

At trial, the Government called approximately 12 witnesses and introduced over 600 exhibits into evidence. The Government's witnesses included several actual or prospective victims of the fraud, two of Bartok's co-conspirators who testified pursuant to cooperation agreements with the Government, a Standing Chapter 13 Bankruptcy Trustee for the Southern District of New York, a trial attorney from the Office of the United States Trustee in the Southern District of New York, a municipal assessor from Bartok's home town, and a summary witness who testified concerning financial records that were in evidence. This witness testimony was amply corroborated by numerous exhibits, including bankruptcy records, bank statements, summary charts, records seized from Bartok's office, letters written by Bartok, and stipulations.

1. **Background**

In 1999, Bartok operated a company operating under the name "U-File-It" (Tr. 192-93).[2] Later that year, Bartok changed the name of this company to Revelations, LLC. (Tr. 194). Between 1999 and 2010 the principal office of Revelations, LLC was located in New

---

[2] "Tr." refers to the trial transcript; "GX" refers to a Government exhibit introduced at trial; and "Bartok Br." refers to Bartok's brief in support of his Rule 33 motion.

4

Jersey. (Tr. 195). Revelations, LLC operated principally in New York and New Jersey (Tr. 324, 1006), but also had customers in Connecticut, Georgia, Florida, and Pennsylvania, (Tr. 1028). In 2010, Bartok again changed the name of the company – to "Foreclosure Club of America" – after Postal Inspectors with the United States Postal Inspection Service searched Revelations' office in Clifton, New Jersey. (Tr. 1037-38).

From at least 1999 through February 2011, Bartok owned and managed the company operating under the names U-File-It, Revelations, LLC, and Foreclosure Club of America (collectively referred to herein as "Revelations"). During this time period, Bartok hired a number of employees, including the cooperating witnesses Kathleen Addario and Veronica Tobin, both of whom ultimately held managerial positions. (Tr. 419, 479).

### 2. Bartok and His Co-Conspirators Lied to Solicit Clients

Bartok and his employees solicited clients by mailing flyers to homeowners who were facing foreclosure. The flyers stated that Revelations could "stop foreclosure without bankruptcy" and provided a phone number to call. (GX 2338, 6011; *see also* Tr. 198-99). When a homeowner called the number listed on the flyer, he or she spoke with Kathleen Addario, or another Revelations employee, who would attempt to schedule an appointment between the homeowner and Bartok. (Tr. 202-03). The homeowners who did schedule an appointment would then meet with Bartok--or in later years Bartok, Addario or Tobin--in Revelations' office. (Tr. 204, 995-96, 1006-07). During the meetings that Bartok attended, he told the homeowners, among other things, that (a) he knew of a method the clients could use to buy back their homes at a foreclosure auction, (Tr. 208), (b) he knew the method worked because he had used it himself, (Tr. 1185-86), (c) he, or another Revelations employee, would accompany the homeowner to the foreclosure sale to help them repurchase their home, (Tr. 209), and (d) to get the benefit of Revelations' services, the homeowner would have to pay an up-front fee of one to two thousand

5

dollars plus a substantial monthly fee, (Tr. 555).  Bartok generally would avoid saying anything about bankruptcy at these meetings, leaving customers with the impression from the flyer that they would not be put through bankruptcy.  (Tr. 553, 996-97).

Bartok's statements to the homeowners in the flyers and in the meetings in Revelations offices were lies.  None of his hundreds of clients ever repurchased a home at a foreclosure auction using his methods.  (Tr. 210, 516, 1011).  Bartok never went to a foreclosure auction with any of his clients.  (Tr. 1011).  Bartok himself lost his home and never bought it back.  (Tr. 1441-42; GX 3544-47).  Finally, Bartok and his co-conspirators put nearly every client through bankruptcy, unless they quit paying before the bankruptcy was filed.  (Tr. 218, 1033).

### 3. Bartok and His Co-Conspirators Deceived Clients About Bankruptcy Filings

Revelations' core business was not repurchasing homes; it was putting clients through bankruptcy.  Bartok was dishonest with his clients about this bankruptcy business, just as he was about his purported methods for enabling clients to repurchase their homes.  In some instances, Bartok would have his employees file bankruptcy petitions in the names of his clients without even telling the clients that he was doing so.  (Tr. 559-60, 623-24, 633-34, 723-24, 728).

More frequently, Bartok would include false statements in these bankruptcy petitions, including gross exaggerations of his clients' income and omissions of their expenses and liabilities.  (Tr. 235-36, 572-74, 635, 1019-22, 1380-84).  Bartok would not tell his clients that he had put these lies in the bankruptcy petitions or that these lies could expose his clients to criminal liability and arrest.  (Tr. 232, 517-18, 555, 636, 641).  The reason that he would not tell his clients about these lies in these documents was that he knew that if his clients knew about the lies, then many of them would not sign these false documents and would not agree to pay him for

6

committing crimes in their names.  (Tr. 1022, 1334-35).  Instead of telling his clients about the lies, Bartok, or one of his employees, generally would forge their signatures on the documents containing these false statements and then file them under penalty of perjury.  (Tr. 231-32, 239, 264-65, 564-66, 567-68, 636-37, 727-28, 730-31, 1022).

### 4. Bartok and His Co-Conspirators Violated Bankruptcy Laws and Tampered With Witnesses in Bankruptcy Proceedings

Bartok's abuse of the bankruptcy system did not end with the filing of fraudulent bankruptcy petitions. The filing of the petitions created an automatic stay on the foreclosure actions that were proceeding against his clients' homes. Accordingly, after the petitions were filed, Bartok would employ a variety of unlawful techniques to delay the inevitable dismissal of those bankruptcy petitions and would thereby prolong the period of time during which his clients would continue to make monthly payments to him before losing their homes. In addition, Bartok would regularly violate bankruptcy law to conceal the participation of Revelations – and thus himself – in this criminal scheme.

First, despite the fact that Revelations prepared the bankruptcy petitions, Bartok directed his employees to not list Revelations or Bartok himself as the bankruptcy petition preparer, as required by Section 110 of the Bankruptcy Code. (Tr. 67, 228, 572, 641, 728-29). This practice continued even after a bankruptcy court sanctioned Bartok in September 2008 for failing to comply with Section 110. (GX 3106, Tr. 306-11).

Bartok also instructed his clients not to attend court proceedings, including mandatory meetings of the creditors, and not to produce documents that they were required to produce at those proceedings. (Tr. 246-47, 254, 562-63, 1028-29). Bartok would also seek to delay his clients' scheduled creditor's meetings by instructing his employees to send letters to the Standing Chapter 13 bankruptcy trustee that falsely stated that the clients were unable to attend the creditor's meeting due to various fabricated scheduling conflicts. (Tr. 247-48, 857-58, 1029). At Bartok's direction, his employees would forge the clients' names on these letters, typically without the client's knowledge. (Tr. 256-57, 656, 657, 864).

8

Bartok and his co-conspirators also filed motions in the bankruptcy courts that bore forged client signatures. (Tr. 255-57, 1031-33). When bankruptcy courts denied one of those motions, as they regularly did, Bartok and his co-conspirators would often then file one or more additional bankruptcy petitions in the client's name--knowing that these would also be dismissed--with the sole purpose of delaying the bankruptcy process and thus delaying foreclosure on the client's home. (Tr. 257-58). In some instances, after the subsequent petitions were filed in the name of the client and dismissed by the bankruptcy court, Bartok and his co-conspirators would instruct the client to transfer an interest in the home to a third party, such as a relative, and would then file yet another bankruptcy petition in the name of the transferee, again for the sole purpose of delaying foreclosure on the client's home. (Tr. 743-50, 1033). The deeds transferring the property interest would often be falsely backdated in order to conceal that the true purpose of the transfer was to delay the foreclosure. (Tr. 313, 337-38, 528, 1033-36).

### 5. Bartok Lied to a Bankruptcy Judge and Told a Co-Conspirator Not to Produce Documents in Response to the Judge's Order.

Bartok's efforts to conceal his participation in the preparation of fraudulent bankruptcy filings failed when two of his clients were arrested in 2008 based on arrest warrants issued by United States Bankruptcy Judge Cecilia Morris in those clients' bankruptcy actions. These arrests led to an investigation by the United States Trustee seeking information about Revelations' practices. In an effort to obstruct this investigation, Bartok lied in documents filed with the bankruptcy court and advised his co-conspirator Kathleen Addario not to comply with an order issued by Judge Morris.

One of the clients whose arrest led to the investigation into Revelations testified at Bartok's trial. This client, Pasquale Degiorgio, explained that prior to his arrest he had not known that Bartok filed a bankruptcy petition on his behalf and was not aware of the filings

entered in his case leading up to his arrest. (Tr. 730-33). These filings included bankruptcy petitions filed in Degiorgio's name, (GX 431, 6002, 6003), on which Degiorgio's signature was forged; a motion by the bank holding the mortgage on Degiorgio's home to terminate with prejudice the automatic stay on the bank's foreclosure action against Degiorgio's home, (GX 434); and an opposition to that motion, on which Andrew Bartok forged Degiorgio's signature, (Tr. 264-65; GX 435). The opposition was filed in the name of Pasquale Degiorgio on January 17, 2006 and was entitled "Objection and Certification to Creitor's Dismissal Motion" [sic] (the "Degiorgio Objection"). The Degiorgio Objection falsely stated that Degiorgio filed the bankruptcy petition, filed the Chapter 13 plan, and adjourned his creditor's meeting. (GX 435 ¶1; Tr. 733-35). The Degiorgio Objection also falsely stated that "the alleged creditor's lawyer and trustee upon information and belief is biased and prejudiced and has shown a pattern of pro se profiling and racial profiling." (GX 435 ¶ 20; Tr. 736).

On January 19, 2006, Judge Morris entered an order directing Degiorgio to appear at a hearing on February 7, 2006, and to show cause why he should not be sanctioned for making "baseless and inapplicable" factual and legal claims "solely for the purpose of delay, harassment, or to increase the costs of litigation." (GX 437 at 3). On February 9, 2006, after Degiorgio did not appear at the hearing, Judge Morris entered an order holding Degiorgio in contempt, directing him to appear at a contempt hearing on March 7, 2006, and stating that if he did not appear at that hearing, "the Court will obtain the assistance of the United States Marshals Service to take the Debtor into custody and compel the Debtor's attendance." (GX 438 at 1; *see generally* Tr. 793-800).

On May 2, 2006, after Degiorgio did not appear at the contempt hearing, Degiorgio and Evelyn Colon, another client of Revelations, were arrested and compelled to

appear before Judge Morris. (Tr. 387, 792). At that hearing, Degiorgio told Judge Morris that he had not known that a bankruptcy petition was filed in his name and had not read or signed the Degiorgio Objection. (Tr. 726, 800-01). Based in part on these statements, the United States Trustee applied for and obtained orders directing Pasquale Degiorgio and Evelyn Colon to appear for examinations at the Office of the United States Trustee. Degiorgio and Colon appeared at the scheduled examinations and produced documents at their examinations, including a flyer from Revelations signed in the name "Kathleen Kelly." (Tr. 801-06; GX 439-41, 6011).

On June 8, 2006, the United States Trustee submitted an application to Judge Morris for an order authorizing the examination of "Kathleen Kelly" and directing the production of documents. (GX 444, 445). The United States Trustee filed the application in order to determine "if any provisions of Title 11, the Federal Rules of Bankruptcy Procedure, the New York State Judiciary Law or any other statutes have been violated in connection with the preparation of the documents related to this and other bankruptcy cases involving the person sought to be examined herein." (GX 444 ¶ 3). On or about June 16, 2006, Bartok filed a document opposing the United States Trustee's application. (GX 446). In this filing Bartok stated that "this is my written objection to the proposed order" and that "I Andrew Bartok am the Owner and Managing Associate of Revelations LLC and all further notices regarding this matter are to be addressed to my attention." (GX 446 at 1). On June 19, 2006, the Bankruptcy Court issued an order directing "Kathleen Kelly" to appear on July 21, 2006 at the Office of the United States Trustee to be examined and produce documents (the "Appearance Order"). (GX 447).

On July 6, 2006 Andrew Bartok filed a motion in the bankruptcy court captioned "MOTION FOR RECONSIDERATION & TO REMOVE JUDGE CECELIA MORRIS" and

11

also captioned as a "CERTIFICATION IN SUPPORT OF RECONSIDERATION and REMOVAL OF JUDGE CECELIA MORRIS." (GX 449A). Bartok alleged in this filing [at ¶ 5] that "Judge Morris is 'biased and has a personal vendetta' against me, Kathleen Kelly, and my company, Revelations Consulting, LLC., located at 4514 Bergen Turnpike, North Bergen, NJ 07047."[3]  In this filing, Bartok concealed and covered up that "Kathleen Kelly" was actually an alias for his co-conspirator Kathleen Addario. Bartok also falsely stated that "Kathleen Kelly" did not have personal knowledge concerning the bankruptcy case referenced in the Appearance Order. (Tr. 275-76; GX 449A ¶ 2).

Bartok and Addario discussed the Appearance Order and the subpoena served by the United States Trustee pursuant to the Appearance Order. (Tr. 279). Bartok advised Addario that she did not have to appear in response to the Appearance Order (*Id*.). Bartok also instructed Addario, "Don't worry about anything. I'm going to handle it." (*Id*. at 279, 283). Neither Bartok nor Addario produced documents at the July 21, 2006 examination at the Office of the United States Trustee, as required by the Appearance Order. (Tr. 275-79, 826-27).

## DISCUSSION

**A.    Applicable Law**

The United States Sentencing Guidelines still provide strong guidance to the Court following United States v. Booker, 543 U.S. 220 (2005), and United States v. Crosby, 397 F.3d 103 (2d Cir. 2005). Although Booker held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. Booker, 543 U.S. at 264.

---

[3] The Bartok Bankruptcy Motion included numerous accusations against Bankruptcy Judge Morris, such as that Judge Morris "acted outside the scope of her employment" and "violated her oath of office and committed perjury when she broke the law and when she failed to follow the law by protecting all pro-se defendants who are under the protection of the 5th, 6th, and 14th Federal Amendments." (GX 449A ¶ 23).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); (2) the four legitimate purposes of sentencing, as set forth below, see id. § 3553(a)(2); (3) "the kinds of sentences available," id. § 3553(a)(3); (4) the Guidelines range itself, see id. § 3553(a)(4); (5) any relevant policy statement by the Sentencing Commission, see id. § 3553(a)(5); (6) "the need to avoid unwarranted sentence disparities among defendants," id. § 3553(a)(6); and (7) "the need to provide restitution to any victims," id. § 3553(a)(7). See Gall, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

**B.    Discussion**

As the testimony and exhibits at trial made abundantly clear, the defendant spent years defrauding his clients of millions of dollars so that he and his family could live a lavish lifestyle while his customers perished in financial ruin. Notably, the defendant did this by systematically obstructing state courts, federal courts and government agencies at every turn.

Indeed, the defendant's entire fraud was built on a systematic strategy of obstruction of justice. As the evidence showed, the defendant and his company filed false documents in state courts seeking to halt the foreclosure. When it was clear that the customer would be evicted from their home, the defendant and his company filed a false bankruptcy petition, followed by false letters to the Chapter 13 Trustee and provided fraudulent advice that the customer did not have to attend any of the bankruptcy proceedings.

Separate and apart from the fact that it was clear that the defendant was engaging in a fraud, federal bankruptcy judges explicitly informed the defendant that he could not prepare bankruptcy petitions nor provide legal advice about bankruptcies. As is abundantly clear from the document submitted to Judge Morris that was the basis of Count Six and documents recovered from Revelations' office, Bartok's response to a judicial order was to attack the judge with *ad hominem* attacks and threaten to seek their removal. (*See* GX 449-A (Motion for Reconsideration and to Remove Judge Morris); GX 6404-D (Complaint Letter to Administrative Office of the Court of New Jersey); GX 6408-B (Complaint Form to U.S. Court of Appeals for the Second Circuit).

At no point in this case did the defendant ever show any respect for the authority of a court or its orders. While on bail in this case, the defendant engaged in numerous acts demonstrating his contempt for anyone who disagreed with him. While on bail in this case, the defendant: (1) violated an injunction issued by the United States Bankruptcy Court in New Jersey ordering him not to advertise or market himself as a bankruptcy petition preparer by offering his services to Robert Conlon; (2) submitted a false affidavit to this Court in order to obtain court appointed counsel; (3) submitted a false statement – through his then counsel – to the Court about his inability to liquidate a financial asset; (4) refused to comply – for a lengthy

period of time – with a Court order to sell an asset; and (5) instructed a family member not to comply with this Court's order to sell the Mercedes because the defendant disagreed with the Court's order.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence on the defendant within the applicable Guidelines range of 95 years' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Dated: White Plains, New York
      May 23, 2013

                                  Respectfully submitted,
                                  PREET BHARARA


                        By:  /s/
                            John P. Collins, Jr./Jeffrey Alberts
                            Assistant United States Attorney
                            Tel.: (914) 993-1919/65

cc: Dawn M. Florio, Esq. (by e-mail and ECF)