Da9ibars ag                    SENTENCE

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                           10 Cr. 510 CS

5    ANDREW BARTOK,

6                   Defendant.

7    ------------------------------x

8                                      October 9, 2013
                                       3:35 p.m.
9                                      White Plains, N.Y.

10   Before:

11                     HON. CATHY SEIBEL,

12                                     District Judge

13                        APPEARANCES

14   PREET BHARARA
          United States Attorney for the
15        Southern District of New York
     JOHN COLLINS
16   JEFFREY ALBERTS
          Assistant United States Attorneys
17
     AMY ATTIAS
18        Attorney for Defendant

19   JOHN M. MARSH, Postal Inspector

20

21                        SENTENCE
22

23

24

25

Da9ibars ag                    SENTENCE

1          THE COURTROOM DEPUTY:  United States v. Andrew Bartok.

2          MR. COLLINS:  John Collins and Jeffrey Alberts for the

3     United States.  With us today are John Marsh from the United

4     States Postal Service and Jake Burke.

5          MS ATTIAS:  Amy Attias for Mr. Bartok.

6          THE COURT:  Have a seat, everyone.  Good afternoon

7     Mr. Collins, Mr. Alberts, Inspector Marsh, Mr. Burke,

8     Ms Attias, Mr. Bartok.  We have a number of items on the agenda

9     so let's get right to it.

10         I think the first thing we should discuss is recusal.

11    I have Ms Attias' not really a motion but request, and then I

12    have also from Mr. Bartok a *pro se* application I guess I'll

13    call it.  I assume you all got this.  It looks like it was

14    e-mailed from Mr. Bartok to his son who may be the one who then

15    mailed it, dated September 26th.  And it's signed by Mr. Bartok

16    on September 28th.  I've actually got two.  One is about

17    recusal and one is a supplemental memorandum on Rule 33.

18         Everybody get both of those?

19         MS ATTIAS:  Yes.

20         MR. COLLINS:  Yes, your Honor.

21         THE COURT:  Okay.  So first of all I'll hear from you,

22    Ms Attias, if you want to add anything in that regard.  Your

23    memo I guess kind of asks me to make more of a record.  Why

24    don't you tell me exactly what you'd like.  Don't worry, my

25    feelings won't be hurt.

Da9ibars ag                     SENTENCE

 1          MS ATTIAS:  First of all, it's nice to see you, Judge.

 2          THE COURT:  You too.

 3          MS ATTIAS:  What I was asking you to do is on the last

 4   date that we were here many months ago and you assigned me to

 5   Mr. Bartok's case, he had asked you to recuse yourself based on

 6   what I call the Whitey Bolger issue.  Mr. Collins then supplied

 7   us all with some documents showing how and when the case came

 8   into the office.  And what I was asking you to do is based on

 9   those particular documents to, I guess, make a supplemental

10   ruling on whether anything that you saw in those documents

11   changed your position on whether or not you needed to recuse

12   yourself.  I was not making any other factual or legal request.

13   I was asking you to sort of, I would call it comment, but I

14   would say make a final ruling based on what you were supplied

15   by Mr. Collins.

16          THE COURT:  The timeline as I understand it based on

17   the government's submission is that Judge Morris, the

18   bankruptcy judge in Poughkeepsie, according to her November 8th

19   letter, had a phone conversation on October 31, 2007 with

20   Margery Feinzig, who was then the assistant United States

21   attorney in charge of the White Plains office.  On November 8,

22   2007 she followed up with a letter, Judge Morris did, addressed

23   to Ms Feinzig.  Apparently she sent another follow-up letter

24   dated December 10, 2007 which we don't have but it's referred

25   to in her March 26, 2009 letter.  On February 15, 2008 the

Da9ibars ag                    SENTENCE

1   United States trustee made a referral addressed to the United

2   States Attorney, Michael Garcia and Ms Feinzig.  And on January

3   21, 2009, after apparently requesting that the Postal

4   Inspection Service look into the issue a little bit, Ms Feinzig

5   initiated the case in the United States Attorney's Office and

6   assigned it to Mr. Collins.  And then March 26, 2009 Judge

7   Morris again poked the United States Attorney's Office, asking

8   for an update and pointing out that Mr. Bartok was continuing,

9   apparently, to conduct business.

10          I left the United States Attorney's Office at the end

11  of July, 2008, so this was not an open matter in the United

12  States Attorney's Office when I was an assistant.  It was

13  opened in January 2009.  I have I'll call it a policy, a

14  personal policy of recusing myself in matters that were open in

15  the United States Attorney's Office when I was there on the

16  theory that as Deputy U.S. Attorney I theoretically supervised

17  all cases in the office, although I emphasize the word

18  theoretically because the vast majority of cases never made it

19  to my level and I had no actual knowledge of them.  I think

20  that policy represents an excess of caution.  I don't know that

21  I would have to recuse on a case that I knew absolutely nothing

22  about.  But as I said, I do it in an excess of caution.

23  Because this case was not an open matter in the United States

24  Attorney's Office during my tenure, it doesn't fall under the

25  policy.

Da9ibars ag                    SENTENCE

1          That said, it looks like a supervisor in the United

2     States Attorney's Office did essentially two things while I was

3     there relating to the case.  One is she spoke to Judge Morris,

4     which I have absolutely no knowledge of, and she made a request

5     of the postal inspectors to look into the matter, of which I

6     also have absolutely no knowledge.  I can reaffirm that I never

7     heard of Mr. Bartok or Revelations or anything about this case

8     until it came to my attention in my capacity as a judge.

9          I therefore find this case to be completely unlike the

10    Bolger case, which maybe has superficial similarity only in the

11    sense that the judge there was in the United States Attorney's

12    Office at the time relevant to the case.  But the situation was

13    completely different because one of the main issues in that

14    case was whether there had been either wrongdoing or grants of

15    immunity conferred by the United States Attorney's Office

16    during the time in question.  Here there's nothing relevant to

17    the trial or the sentencing that relates in any way to the

18    internal workings of the United States Attorney's Office.

19         The First Circuit in the Bolger case, which is 710

20    F.3d 42, felt that a different judge should preside because the

21    defendant was claiming that he was promised immunity by what

22    they call the government's prosecutorial apparatus in Boston,

23    and because the judge was part of that prosecutorial apparatus

24    a reasonable member of the public would think that he would

25    only be human in reacting to the claim in a defensive or

Da9ibars ag                    SENTENCE

1    adversarial way.

2              There's no analogous claim here.  There was nothing

3    going on within the United States Attorney's Office while I was

4    there that is at all relevant.  The court noted that it would

5    have to be something more than just the claim to warrant

6    recusal, because any defendant who didn't like his judge could

7    just make some spurious charge.  But they found that in this

8    case, in the Bolger case, there was what they call the

9    necessary independent support for the plaintiff's challenge,

10   referring to documents and other reports and public proceedings

11   that disclosed what they called disquieting links between the

12   government and the criminal elements during the years in

13   question.  Again, nothing like that here.  And ultimately the

14   Bolger court said while these disclosures of record didn't

15   necessarily add up to anything, they tended to indicate that

16   the government and the defendant were not at arm's length

17   during the period in question and that evidence about the terms

18   on which they dealt with each other could reflect on the United

19   States Attorney's Office as it was constituted in the days when

20   the judge was a member.  Again, nothing in this case would

21   reflect on the United States Attorney's Office as it was

22   constituted in my day.  So I don't think that a reasonable

23   member of the public would think there was any problem with my

24   presiding.

25              Mr. Bartok in his letter adds to the argument some

Da9ibars ag                          SENTENCE

1   additional considerations.  He says I spent over 25 years in a

2   position of high responsibility in the office of the U.S.

3   Attorney in the White Plains courthouse.  That's actually not

4   correct.  I spent, of my, how many years as a prosecutor,

5   almost 21 years as a prosecutor, I spent ten of them in White

6   Plains.  I was a supervisor for a couple of them, a couple of

7   the ten years.  He says that I'm a close friend of U.S.

8   Bankruptcy Judge Cecelia Morris and federal attorneys John

9   Collins and Jeffrey Alberts, and had a personal relationship

10  during my tenure as an United States Attorney with Postal

11  Inspector John Marsh.  None of that is true.  I certainly know

12  Mr. Collins and Mr. Alberts since they joined the United States

13  Attorney's Office, but close friends we are not, put it that

14  way.  And Judge Morris I've met a handful of times and spoken

15  to a handful of times.  Close friends we are not.  And

16  Inspector Marsh I believe I knew when I was in the United

17  States Attorney's Office, but I don't think we ever even worked

18  on a case together.  So I certainly am professional

19  acquaintances with all of those people.  I certainly don't

20  consider them close friends nor do they consider me a close

21  friend.  Indeed, I would venture to say I have more "friend"

22  type conversations with Ms Attias than with any of those other

23  people.

24          So I don't think the reasonable observer would think

25  that I would be favoring the government in any way because of

Da9ibars ag                    SENTENCE

1   my acquaintance with the prosecutors.  And Mr. Alberts probably

2   remembers me acquitting a defendant in a bench trial that he

3   has, so he probably knows better than anybody that no matter

4   how fond I may be of him, it's not getting him any special

5   treatment.  And I go into this not to suggest that recusal

6   would be necessary if any or all of those things were true.  If

7   I were close friends with the prosecutors or Judge Morris or

8   with Inspector Marsh, I am not saying that recusal would be

9   necessary if any of those things were true, I'm just saying

10   that none of those things are true.

11          So I don't believe the standards of Title 28 U.S. Code

12   Section 455(a) are met.  That statute provides that a federal

13   judge "shall disqualify himself in any proceeding in which his

14   impartiality might reasonably be questioned.  It extends not

15   just to actual bias, but rather situations where an objective

16   informed observer could reasonably question the judge's

17   impartiality regardless of whether or not she is actually

18   partial."  So the question is would a reasonable person knowing

19   all the facts conclude that this judge's impartiality could be

20   questioned, or as the Bayless court put it, Second Circuit, 201

21   F.3d 116, 126, "would an objective disinterested observer fully

22   informed of the underlying facts entertain significant doubts

23   that justice would be done absent recusal."

24          So I don't see how that standard could be met given

25   the complete lack of contact between me and this case while I

Da9ibars ag                    SENTENCE

1    was in the United States Attorney's Office, the fact that it

2    wasn't even an open matter within that office while I was

3    there, and the absence of any particular relationship with the

4    prosecutors involved.

5          I also agree with the government that the issue was

6    waived.  The government's brief lays out, so I won't repeat,

7    all the instances where Mr. Bartok raised these issues,

8    Ms Florio when she was representing Mr. Bartok raised the

9    issue, Ms Attias certainly knew when I was in the United States

10   Attorney's Office and when I left because we had matters

11   together.  And I could be wrong about this, I'm not a hundred

12   percent sure, but I don't think I was ever formally asked to

13   recuse, in which case the subject would be waived.  But in any

14   event, it is without merit.  I don't see any need to recuse

15   myself.  So that's number one.

16         Number two is the Rule 33 motion.  And I've got

17   defendant's brief which was submitted by Ms Florio.  I've got

18   the government's opposition.  I've got Mr. Bartok's letter of

19   September 28th.  Is there anything you wish to add, Ms Attias,

20   on the new trial issue?

21         MS ATTIAS:  No, Judge, there's nothing else I wish to

22   add to Ms Florio's motion.

23         THE COURT:  Okay.  And I take it the government has

24   nothing to add?

25         MR. COLLINS:  No, your Honor, unless there are issues

Da9ibars ag                    SENTENCE

1   in Mr. Bartok's most recent letter that you would seek argument

2   in court on.

3          THE COURT:  No.  I think his letter was basically --

4   let me take another quick look at it, but it seemed to not have

5   anything new in it.

6          MR. COLLINS:  I believe --

7          THE COURT:  Oh, the bribery.  That issue coming back,

8   that was a popular argument coming out of the jails some years

9   ago, the notion that cooperation agreements amounted to

10  bribery.  I haven't seen it in a long time, perhaps because the

11  Second Circuit said it's not bribery.

12         But let me turn first to the motion made by Ms Florio.

13  She argues essentially that Mr. Bartok was not shown to have

14  intent to defraud customers.  She notes that the cooperating

15  witnesses didn't testify that the defendant intended to defraud

16  or knew his actions were unlawful.  She points out that he did

17  help customers delay their foreclosures, and he knew he was

18  stretching the Bankruptcy Code but did not believe his actions

19  were illegal.  And her second argument is that I should have

20  charged the jury on Section 1001(b) which exempts parties and

21  counsel from Section 1001(a) of Title 18 which forbids false

22  statements in a judicial matter.

23         The government responds with a litany of evidence that

24  it says shows the defendant's intend to defraud.  They point

25  out that Mr. Bartok held himself out as a foreclosure expert

Da9ibars ag                    SENTENCE

1    and claimed to know about "legal loopholes," that he

2    represented to his clients that they could buy back their home

3    at a foreclosure auction for a fraction of what they owed when

4    that never happened, he told at least some clients that his

5    program did not involve bankruptcy.  Even the ones who knew it

6    involved bankruptcy weren't told that there were going to be

7    false statements and petitions or forged signatures.  He

8    falsely represented that he bought back his own house

9    successfully using his method and he promised that he or

10   another employee would go to the auction with the customer to

11   buy the house back.  And none of these things were true.

12           I would add to that, the roadmap that Mr. Bartok used

13   was his little airplane drawing with his customers in an

14   initial meeting where he was trying to sell them on his plan.

15   It seems to me those were certainly false representations to

16   customers in that the calculation depended on two things that

17   Mr. Bartok had to know were false statements.  One is the math

18   only worked if the sale price of the client's home was high

19   enough, and Mr. Bartok essentially pumped out of thin air what

20   he used to calculate the sale price.  And also, his whole plan,

21   I use that term in quotation marks, would involve telling the

22   client, just to use an example, okay, you're paying 1500 a

23   month in your mortgage.  Instead give me 500 a month, sock away

24   the other thousand by the end of two years you'll have $24,000

25   and you can buy your home back.  That math only works if the

Da9ibars ag                    SENTENCE

 1    person actually had $1500 a month, and if the person had the

 2    1500 a month he or she would be paying the mortgage with it.

 3    So the only reason they're in Mr. Bartok's office is because

 4    they don't have $1500 a month.  And they were too desperate or

 5    inattentive or unintelligent to see that and he took advantage

 6    of that.

 7          In addition, the government points to false statements

 8    made in bankruptcy petitions including forged signatures,

 9    exaggeration of income, and omission of debts and liabilities,

10    as well as the omission of any indication of either himself or

11    Revelations as a preparer of the petition.  They point to many

12    other violations of the bankruptcy laws such as instructing

13    debtors not to appear at their Section 341 meetings, delaying

14    341 meetings for false reasons in forged letters, filing false

15    motions with forged signatures, filing second and subsequent

16    petitions on behalf of clients without any good-faith basis for

17    believing a second bankruptcy in that time frame would be

18    legit, instructing clients to transfer their homes to a third

19    party including the false backdating of deeds so that the third

20    party could file bankruptcy, and advising Ms Addario not to

21    show up for her examination with the U.S. Trustee, and

22    concealing the fact that Kathleen Kelly really was Kathleen

23    Addario, and falsely stating that Ms Addario had no knowledge

24    about the matter that Judge Morris was looking into, and making

25    what I'll call wild accusations against the trustee and Judge

Da9ibars ag                         SENTENCE

Morris without any good-faith basis.  They further argue that

this motion is not timely and that the 1001(b) charge is not

warranted.

          I think the government is right, that the motion is

untimely.  The verdict in this case came in on October 24, 2012

and defendant had 14 days to make the motion which would give

him until November 7th.  At the time of the verdict I put on

the record as follows.  "If there are going to be posttrial

motions, which I'm not inviting, but if you want to make them,

of course you're entitled to.  The statute I think gives you 14

days and I don't think I can extend that.  But if you make a

motion within 14 days and ask me for extra time to file a brief

I can do that.  So if there are going to be motions, talk to

the government about a schedule and file whatever you have to

file by the statutory deadline and then if you can agree on a

briefing schedule I'm sure it will be fine with me."

          For reasons I don't understand, Ms Florio did not do

that.  She did propose a briefing schedule on November 1st

which I approved which allowed for her brief to be filed

November 20th, but the motion should have been filed 14 days

after October 24th and it was not.  So the motion is out of

time.

          Nevertheless, I will reach the merits in an excess of

caution.  With respect to the argument, the sufficiency

argument, that there was insufficient evidence of intent to

Da9ibars ag                    SENTENCE

1   defraud, the parties correctly set forth the legal standards in

2   their papers.  It's an uphill battle for any defendant.  But

3   especially for this defendant, it is like climbing up a

4   straight cliff, because I think that the evidence in this case

5   was overwhelming, essentially for the reasons stated by the

6   government.  I found first of all the government witnesses

7   credible.  Apparently the jury did too.  And like them, I have

8   no doubt that Mr. Bartok defrauded his clients to get their

9   money under false pretenses including all the ones I listed a

10  moment ago.

11          The evidence was abundantly clear that he knew these

12  statements were false and told them to the clients in order to

13  get the sizable initial fee and to perpetuate the monthly fee

14  that he received.  And it's irrelevant that the cooperators did

15  not say in so many words that the defendant intended to defraud

16  or the defendant knew his actions were unlawful.  Their opinion

17  on those subjects wouldn't have been admissible anyway.  Not to

18  mention how unlikely it would be that he would actually say in

19  so many words I intend to defraud and I know my actions are

20  unlawful.  But that that he has that knowledge and that intent is an

21  overwhelming inference from the evidence, and the only

22  explanation for the litany of lies and violations of bankruptcy

23  rules that I described a moment ago.

24          It's also irrelevant that Mr. Bartok's machinations

25  did allow his customers to stay in their houses longer and

Da9ibars ag                    SENTENCE

1   delayed the foreclosure.  He did not tell them:  Look, I'm

2   going to do all sorts of illegal things and tell all sorts of

3   lies to delay your foreclosure.  He promised them all sorts of

4   things that were not true.  He concealed what he was going to

5   do.  And he did that to get their money for as long as

6   possible.  And there were many, including some who testified,

7   who would not have given him a nickel had he told them the

8   truth.  Although the record shows many, many homeowners who

9   lost their homes, it doesn't show a single one who bought it

10  back as Mr. Bartok said could be done.  And the victim impact

11  statements certainly show many customers threw their money away

12  and ended up worse off after paying Mr. Bartok for all those

13  months than they might have been had they put that money to

14  better use.  So I think the evidence is overwhelming that

15  Mr. Bartok defrauded his customers.

16          I gather the argument that the defendant "stretched"

17  the Bankruptcy Code but did not know he was doing anything

18  illegal is directed at counts other than the counts involving

19  the defrauding of customers, or maybe it's directed at both.

20  In any event, the evidence is more than sufficient that the

21  defendant knew he was doing more than stretching the Bankruptcy

22  Code.  You don't forge documents or lie to courts and think

23  that those are simple stretches of the Bankruptcy Code.

24  Indeed, he was told specifically not only by information that

25  was actually printed on the forms themselves but also by

Da9ibars ag                    SENTENCE

 1   various judges what the Bankruptcy Code required.  So he cannot

 2   say in good faith that he was trying to comply with the Code.

 3   He was enjoined from doing things by judges and kept doing

 4   them, and the forms involved aid what was and wasn't allowed,

 5   and he doesn't need a judge to tell him that lying on

 6   bankruptcy forms is not permitted under the Bankruptcy Code.

 7   So his conduct went way beyond a creative interpretation of the

 8   Bankruptcy Code and way beyond aggressively interpreting the

 9   code without criminal intent.  The evidence overwhelmingly

10   shows that he was lying and deceiving and obstructing.  So I

11   don't find this to be even a close case on sufficiency.

12          With respect to the 1001 count, the charge in Count 6

13   referred to two false statements that the defendant made in a

14   document called:  Motion for reconsideration and to remove

15   Judge Morris.  Those statements were that Kathleen Kelly, that

16   name in quotation marks, didn't have personal knowledge about

17   Mr. DiGiorgio's case, and concealment of the fact that Kathleen

18   Kelly, in quotation marks, was Kathleen Addario.

19          Mr. Bartok at trial argued that he should be able to

20   take refuge in the safe harbor for parties or attorneys.  I

21   held then and I hold now that he was neither a party nor an

22   attorney in that case.  He is not a licensed attorney period.

23   And Mr. DiGiorgio was the party, not Mr. Bartok.  Having

24   received a power of attorney to act for a party for a specific

25   purpose doesn't make you an attorney for purposes of 1001(b);

Da9ibars ag                    SENTENCE

```
1   it doesn't make you an attorney for any purposes.  Moreover,
2   that document, the motion for reconsideration and to remove
3   Judge Morris, was not prepared on behalf of DiGiorgio.  It was
4   prepared in Mr. Bartok's own capacity as what he called the
5   owner and managing associate of Revelations as a volunteer in a
6   proceeding involving "Kathleen Kelly".  So even if Mr. Bartok
7   were somehow an attorney because he has power of attorney to
8   act for Mr. DiGiorgio, he was not acting for Mr. DiGiorgio when
9   he submitted that document which contained the false statements
10  and the material omission.
11          So for those reasons, the motion filed by Ms Florio on
12  Mr. Bartok's behalf is denied.
13          I have the September 28, 2013 letter from defendant
14  seeking to supplement the Rule 33 motion.  It is untimely.  But
15  I will reach the merits in an excess of caution.  The argument
16  that a cooperation agreement was a promise that the government
17  will request the court to give credit for cooperation if the
18  cooperator holds up her end of the deal amounts to bribery is
19  frivolous.  Let me say that again.  The argument the defendant
20  wants to make is frivolous.  The argument is that it amounts
21  for bribery for the government to enter into a cooperation
22  agreement with a defendant in which the government promises to
23  ask the courts to take the cooperation into account at
24  sentencing time if the cooperator holds up her end of the deal.
25  That argument was rejected in 1999 in U.S. v. Stephenson, 183
```

Da9ibars ag                    SENTENCE

1    F.3d 118.  That's a Second Circuit case binding on me.  And in

2    any event, all the details with respect to the cooperation

3    agreement and the incentives they might give to the witnesses

4    were before the jury.

5         Mr. Bartok also mentions in that letter that he still

6    wants to know who signed the indictment.  Rule 7, which covers

7    indictments, says it has to be signed by an attorney for the

8    government and Rule 1(a) defines an attorney for the government

9    to include an authorized assistant.  And as far as I know, for

10   many years now the United States Attorney for the Southern

11   District of New York has authorized a number of assistant

12   United States attorneys to sign documents.  And there is no

13   reason to believe that the proper procedures were not followed

14   in this case.  And frankly, even if they weren't, I can't

15   imagine that it would make a difference.

16        Now to I want to turn to the sentencing.  Let me start

17   by putting on the record everything I've received.  I want to

18   make sure I have everything.  I have the presentence report

19   dated May 22nd.  I have a series of letters from the United

20   States Attorney's Office victim witness coordinator dated

21   December 11, 2012, December 27, 2012, March 14, 2013, April 2,

22   2013 and September 26, 2013 enclosing a bunch of victim impact

23   statements, about 48 victim impact statements.  I have the

24   government's sentencing memorandum dated May 23rd.  I have

25   Ms Attias' sentencing letter dated September 18th.  I have the

Da9ibars ag                    SENTENCE

1    government's second sentencing memorandum dated September 27th.

2    And I have the spreadsheets that I got, I got it today, it may

3    have been e-mailed to my chambers yesterday, the spreadsheet of

4    the individuals and dollar amounts as to whom the government is

5    seeking a restitution order.  Is that everything I should have

6    or am I missing anything?

7              MS ATTIAS:  That's all that I'm aware of, Judge.

8              MR. COLLINS:  Yes, your Honor.

9              THE COURT:  Okay.  Mr. Bartok, have you read the

10   presentence report and the addendum?

11             THE DEFENDANT:  No, I haven't.

12             THE COURT:  Why is that?

13             THE DEFENDANT:  Well, it's real simple.  I was waiting

14   for my attorney at the time, Dawn Florio, to come meet me so we

15   could go over the presentence report.  She never came over to

16   see me.  Next time I saw her was when I was in court with you

17   and I raised the issue about the Whitey Bolger issue.

18             THE COURT:  What about between then and now?

19             THE DEFENDANT:  Sorry?

20             THE COURT:  Why haven't you read it between then and

21   now?

22             THE DEFENDANT:  Because I don't have it with me

23   because they moved me out of Valhalla and they wouldn't let me

24   take it.  So I don't have it.

25             THE COURT:  Did you ask your lawyer for a copy?

Da9ibars ag                    SENTENCE

1          THE DEFENDANT:  Well, I wasn't able to get in touch

2    with my lawyer for over a month, as they prepared to move me.

3          THE COURT:  Have you gone over the presentence report

4    with your client?

5          MS ATTIAS:  I have, Judge.  I went over it with him

6    when he was in Valhalla.  I mailed him not only the second and

7    final disclosure of the presentence report but I mailed him a

8    copy of my letter and I mailed him a copy of, I knew he had

9    already had Mr. Collins' first submission, and I mailed a copy

10   of the second submission.  And I received letters from

11   Mr. Bartok almost every day, sometimes twice a day.

12         THE COURT:  Did he raise any issue with the

13   presentence report in any of those letters?

14         MS ATTIAS:  Yes, of course.  We've discussed the

15   guideline range of 95 years.  We discussed what I was going to

16   be asking.  We discussed -- while he was still in Valhalla I

17   asked him if he would consider getting some letters mailed to

18   me so that I could submit them on his behalf from friends and

19   family, and without disclosing the content of the discussions,

20   I will simply say that we did discuss that and he made

21   decisions accordingly.

22         THE COURT:  I'm a little baffled, Mr. Bartok.  If

23   Ms Attias -- let me ask this question.  Ms Attias, when you say

24   you sent the report to Mr. Bartok, did you send it to him at

25   Valhalla or where he is now?

Da9ibars ag                    SENTENCE

1          MS ATTIAS:  He was in Valhalla when the second

2     disclosure came out.  So that one I brought to Valhalla and we

3     discussed it there.  The letters, a copy of my letter and a

4     copy of Mr. Collins' letter, I actually mistakenly first sent

5     to Valhalla, and then I realized he had been moved I sent them

6     again to the MCC.

7          THE COURT:  Well, Mr. Bartok, I really think you

8     should read the presentence report.  So if you haven't read

9     it --

10          THE DEFENDANT:  The question you asked me Judge was

11     did I discuss it with my attorney, and my answer to you was no,

12     I did not discuss it with my attorney.  They might have

13     mentioned one or two things, but we never sat down and went

14     over the presentence report.

15          THE COURT:  Why don't you do that right now.  We'll

16     continue this tomorrow.

17          MS ATTIAS:  There is no "they," Judge.  It's me, and

18     I'm telling you as an officer of the court that I sat down with

19     Mr. Bartok in a counsel room in Valhalla and went through the

20     entire presentence report.

21          THE DEFENDANT:  That's not true.

22          THE COURT:  I believe you.

23          THE DEFENDANT:  That's not true, Judge.

24          THE COURT:  We don't need to have a he said/she said

25     over it.  Ms Attias is here right now.  Go downstairs, go over

Da9ibars ag                    SENTENCE

```
 1    the presentence report with her.  What's your folks' schedule
 2    look like tomorrow?
 3              MR. COLLINS:  Is there time in the morning, your
 4    Honor?
 5              THE COURT:  I think so.  And you need to understand,
 6    Mr. Bartok, Ms Attias is going to make herself available to you
 7    right now.  If you don't have a copy of the report with you in
 8    your current facility, she'll give you one.  If you choose not
 9    to talk to her about it or you choose not to read it, you'll
10    have waived your rights in that regard.
11              MR. COLLINS:  For the record, your Honor, I'm handing
12    Ms Attias my copy of the presentence report which she now has
13    in her hands.
14              THE COURT:  And she can give that extra one to
15    Mr. Bartok.
16              MS ATTIAS:  With the marshal's permission, I'm going
17    to hand it to him now so when I go downstairs we can go through
18    his copy and my copy, and we can go through it page by page.
19              THE DEFENDANT:  I have one problem.  I don't have my
20    glasses with me.  I'll have a hard time reading this.
21              THE COURT:  Well, you can take it back with you if the
22    marshals let you.  But in the meantime, you'll have Ms Attias
23    to go through it with you and say what's in it.  So --
24              THE DEFENDANT:  Is it possible I can get my glasses?
25              THE COURT:  I don't know where your glasses are.
```

Da9ibars ag                      SENTENCE

 1              THE DEFENDANT:  My reading glasses.  I didn't bring

 2     them.

 3              THE COURT:  Then you'll read this tonight in your

 4     cell.  You can go over it with Ms Attias now and depending on

 5     what time we convene tomorrow you can do it then tomorrow.

 6              How about 10:30 tomorrow?

 7              MS ATTIAS:  That's fine.

 8              MR. COLLINS:  Yes, your Honor.

 9              THE COURT:  When you get here in the morning,

10     Mr. Bartok, you tell Ms Attias if there's anything in the

11     presentence report that you have concerns about.  And I

12     believe, Ms Attias, that this is a repeat of an exercise that

13     you did back in May, and I'm not happy that the taxpayers are

14     going to have to pay to do it again.  However, I don't want

15     there to be any argument that your rights weren't fully

16     respected.  You can talk to Ms Attias now about the presentence

17     report and read it over again tonight and talk to her about it

18     again in the morning.

19              THE DEFENDANT:  Thanks for getting me a copy, Judge.

20              THE COURT:  Mr. Collins, I don't see anyone here who

21     is a victim.  Were you expecting anybody to come and speak,

22     because I would do that now.

23              MR. COLLINS:  No, your Honor.  Obviously we sent out

24     letters pursuant to statute advising the victims of their right

25     to attend the proceedings.  I did not receive any affirmative

Da9ibars ag                    SENTENCE

 1   notice from any of the victims saying that somebody would

 2   actually be addressing the Court.  So I have no knowledge that

 3   any victim was going to be here and going to be making a

 4   statement to the Court.

 5          The other issue, your Honor, that I rise about, is my

 6   understanding is that Mr. Bartok is being housed at MCC.

 7   Normally, when someone has come from the MCC, we try to give

 8   the marshals as much notice as possible because it's a burden

 9   upon them.  If you could request the marshals produce

10   Mr. Bartok from the MCC tomorrow --

11          THE MARSHAL:  Don't worry.

12          THE COURT:  The record should reflect the sentencing

13   began at 3:30.  I assume that's what time the victims were told

14   it was going to be if they wanted to be here.  It's now 4:25

15   and nobody seems to be here.  So I think we're safe in assuming

16   that they are resting on their submissions.

17          See you at 10:30 tomorrow.

18          (Proceedings adjourned)

19

20

21

22

23

24

25