1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------x

3   UNITED STATES of AMERICA,

4           -against-                    10 Cr. 510

5   ANDREW BARTOK,

6                   Defendant.

7   ------------------------------------x

8
                                    United States Courthouse
9                                   White Plains, New York

10                                  April 5, 2012

11
    B e f o r e :
12
                        HON. CATHY SEIBEL,
13                              District Court Judge

14  A P P E A R A N C E S :

15  JOHN COLLINS
    JEFFREY ALBERTS
16          Assistant United States Attorneys

17

18  AMY ATTIAS
            Attorney for Andrew Bartok
19

20

21

22

23

24
    ANGELA A. O'DONNELL, RPR
25  Official Court Reporter

1                    P R O C E E D I N G S

2            THE CLERK:  United States of America against

3    Andrew Bartok.

4            THE COURT:  Have a seat everyone.  Good morning

5    Mr. Collins, Mr. Alberts, Mr. Burke, Ms. Attias and

6    Mr. Bartok.

7            So I have Ms. Attias's motions and the

8    Government's response thereto.  And, as I understand it, the

9    government is in agreement that Count Ten needs to be

10   severed not because it's improperly joined but because,

11   under Rule 42, a different judge should handle Count Ten?

12           MR. COLLINS:  Your Honor, we believe, after

13   consultation with people who are much more knowledgeable and

14   smarter in my office, that pursuant to Rule 42(a)(3) the

15   most prudent course of action in this case would be to have

16   that count severed and then, if it's to be tried at a later

17   date, to be tried by a different District Judge.

18           THE COURT:  I don't accept the proposition there

19   are smarter people in the office, but, yes, I looked at the

20   rule and it seems to me what Count Ten charges is the

21   failure to comply with an order, and I don't think that

22   necessarily implies disrespect of criticism of the Court,

23   and I actually just did a quick search and there is one case

24   in the Eastern District of Tennessee saying as much.  But if

25   both parties are in agreement on something, I'm not going to

1   stand in the way.  And it probably is, in an excess of

2   caution, the prudent course.  And, who knows, maybe events

3   will develop such that the government decides it doesn't

4   need to pursue that count.

5            MR. COLLINS:  We agree, your Honor.  We don't,

6   just to make clear the Government's position, we don't, we

7   believe that based upon, the only case we can find is the

8   same one that I believe your Honor is referring to, *Moncier*.

9            THE COURT:  Correct.

10            MR. COLLINS:  M-O-N-C-I-E-R, which the Sixth

11   Circuit reversed based upon Rule 42.

12            THE COURT:  But on different grounds.

13            MR. COLLINS:  I thought they actually did reverse

14   on the Rule 42(a)(3) grounds.  So, as a result, that's sort

15   of, given that *Moncier* is the only case out there, we

16   believe it's, in terms of being prudent, that we've taken

17   this position.

18            THE COURT:  Well, that's fine.  The motion to

19   sever Count Ten is granted.  Then this raises a practical

20   question in my mind, which is, Count Eight sort of goes with

21   Count Ten.  Why not just sever Count Ten as well and then

22   try those two separately?

23            MR. COLLINS:  With regard to that point, your

24   Honor, we don't actually, we respectfully have a different

25   viewpoint, which is that the reason why we're agreeing to a

 1    severance of Count Ten is statutory grounds, that we believe

 2    it's prudent pursuant to Rule 42(a)(3) which addresses that

 3    count on statutory grounds that it should be severed.  Were

 4    there not to be Rule 42(a)(3), we would not be agreeing that

 5    there should be a severance of Count Ten.  Especially in

 6    light of --

 7            THE COURT:  No, I understand.  Your argument is

 8    both of the counts are properly joined under Rule 8.  Count

 9    Ten is only leaving us because of Rule 42.  But just as a

10    practical matter, wouldn't it be sort of clean to send Count

11    Eight off to another judge along with Count Ten?

12            MR. COLLINS:  No, because as we argue in our

13    brief, your Honor, even though Count Ten, even though we've

14    agreed and your Honor has now ordered that Count Ten be

15    severed, we take the firm position, your Honor, that the

16    evidence supporting both counts, Eight and Count Ten, would

17    be admissible in the trial of Mr. Bartok with regard to all

18    the other counts.  And since the evidence would be, since

19    the evidence would be admissible and be heard before the

20    jury, it simply doesn't make either sense from, in terms of

21    judicial economy under Rule 14 or under Rule 8 since they're

22    properly joined for Count Eight to be severed.

23            THE COURT:  Let me ask you a legal question.

24    Whether the evidence would be admissible even if the count

25    were severed is obviously an important factor under Rule 14,

1    but under Rule 8 aren't you supposed to look at the

2    character of the offenses and not the fact that it might or

3    might not be admissible?

4             MR. COLLINS:  Yes, your Honor.  And I think, if

5    you do look at both, if you look at the counts, clearly

6    Count Eight is of the same or similar character to other

7    counts that are in the Indictment, just looking at the 1001

8    count, Count Eight charges that Mr. Bartok committed

9    perjury, that he lied to the Court with regard to his assets

10   in order to secure a CJA appointment.  With regard to Count

11   Six, your Honor, of S4, that alleges that Mr. Bartok made a

12   false statement to the Bankruptcy Court, specifically he

13   made a false statement to Judge Cecelia Morris.  Clearly,

14   just looking at those two counts alone, without the fact

15   that essentially the purpose behind Count Eight is to commit

16   a fraud, which is what a number of the counts address in S4,

17   that count is, Count Eight is of the same or similar

18   character.  It's essentially --

19             THE COURT:  It's a false statement.

20             MR. COLLINS:  To the Court.

21             THE COURT:  It's a false statement to a Court.  I

22   looked at the Government's cases, they all seem to involve

23   perjury charges where, if perjury relates to the substantive

24   counts at least to the extent that they involve the same

25   entity.  The *Werner* case, which is the one where the general

 1   likeness comes in, it was a theft and it was a robbery, but

 2   it was from the same place and it was a place where the

 3   defendant worked.  In *Ruiz*, it was a false loan application

 4   and perjury, but both arose from the defendant's operation

 5   of the same business.  And in *Josephberg* it was a healthcare

 6   fraud, a nanny tax fraud and an income tax fraud, and the

 7   Court did say these are all dishonest acts to get money, but

 8   there was more.  The healthcare fraud, as I read that case,

 9   involved falsely carrying the defendant's wife as an

10   employee of a particular corporation so that she could get

11   health coverage, and the income tax fraud involved hiding

12   money in the same corporation.  So there was some connection

13   in that all the counts arose from the operation of the same

14   entity.  Here most of the counts arise from the operation of

15   Revelations, but the false financial affidavit doesn't.

16          Are there cases where perjury is joined with other

17   frauds or false statements where the only connection is

18   really what we have here, which is a "but for" connection?

19   Obviously but for the defendant's operation of Revelations,

20   he wouldn't have been indicted, and but for being indicted

21   he wouldn't have had to put in a financial affidavit.  But

22   it seems like the cases all had some connection beyond a

23   "but for" connection or beyond just it was two lies or two

24   frauds.  It was two lies or two frauds that grew out of the

25   same entity or the same business it seemed to me.

1            MR. COLLINS:  Well, your Honor, the view that -- I

2  understand your Honor's position.  If I remember correctly,

3  and I'm trying to find it now, one of the cases dealt with

4  perjury concerning a bank, concerning a bank robbery.  And

5  here, actually, and I think there was the *Potamitis*.

6            THE COURT:  That was where the perjury in the

7  Grand Jury was to cover up the underlying crime.

8            MR. COLLINS:  Yes, your Honor, but there's also

9  that element here as well.  Because, if you look at the

10  affidavits, and part of the Government's proof with regard

11  to Count Eight is that one of the things that Mr. Bartok

12  lied about was the money that he actually earned from

13  Revelations.  In relying on the financial affidavit, he lies

14  about what he earned during the preceding 12 months, which

15  is relevant to the Government's case, because what

16  Mr. Bartok was doing was, in the same manner that the

17  conspirators with regard to the bankruptcy are trying to

18  minimize or obfuscate what occurred previously, Mr. Bartok,

19  in his affidavit, when he lies about how much money he

20  earned during the previous 12 months, and there simply

21  cannot be any dispute about that --

22            THE COURT:  But you didn't charge that lie.

23  You've charged two lies:  One that he didn't have any cash

24  on hand or money in savings or checking; and, two, that he

25  lied about the property he owned.  You haven't charged that

1    he lied about his income in the previous 12 months.

2              MR. COLLINS:  Yes, your Honor.  But with regard

3    to, again, that goes to the evidence that's going to be

4    admitted at trial, with regard to Mr. Bartok's accumulation

5    of assets and with regard to his cash on hand, the same bank

6    records that the government would be using to prove the

7    assets that Mr. Bartok accumulated during the course of his

8    fraud and the money that he gained on hand and how he

9    disposed of it, that's the income from Revelations.

10             THE COURT:  Right.  But you didn't charge him

11   about lying about his income.  I mean, if you've got

12   evidence that, you're going to prove that he took in gobs of

13   money from this business and that he spent gobs of money.

14             MR. COLLINS:  Yes.

15             THE COURT:  That would not be admissible on Count

16   Eight because Count Eight doesn't charge him with lying

17   about what he took in, it charges him with lying about what

18   he had on the day of the affidavit.

19             MR. COLLINS:  Yes, your Honor.

20             THE COURT:  So what he had on the day of the

21   affidavit, unless you show that what he took in he still had

22   on the day of the affidavit, I don't really follow it.  The

23   bank records that show he took gobs in and he spent gobs

24   isn't going to prove what he had on hand on whatever the

25   date was.

1          MR. COLLINS:  March 15.

2          THE COURT:  March 15, 2011.  Right?  I mean, it's

3    two different -- if you had charged him with an additional

4    lie on the financial affidavit in that he covered up income

5    that he received in the previous 12 months from Revelations,

6    your position would be stronger.  But I don't see that.

7          MR. COLLINS:  Well, I guess, your Honor, then we

8    go back to clearly then under Rule 8 that Count Six and

9    Count Eight of the same or similar character, they're lying

10   to the Court.

11         THE COURT:  I mean, I think you have even a

12   stronger argument than that.  I mean, Counts One through

13   Four also involve lying to the Court because you've alleged

14   that this whole scheme involved filing bankruptcies for

15   clients that were full of false statements.  False

16   statements to Bankruptcy Courts are all over this case.

17         Is it enough that this is also a false statement

18   to a Court as opposed to a false statement?  I mean, there

19   are cases where a defendant is charged with false statement

20   to a bank and then a false statement to an investor and

21   those get severed.  Just because it's two dishonest things

22   that the same guy allegedly did isn't enough to find they're

23   a same or similar character.

24         Is the fact that here it's not just false

25   statements to various people, it's false statement to the

1    Court enough to make it same or similar character?

2              MR. COLLINS:  Well, it's even more specific, your

3    Honor, than false statements to courts generally.  We're not

4    even talking about a false statements to a state court and a

5    false statement to a federal court, we're talking about two

6    false statements to United States Judges.

7              THE COURT:  Well, only one was an Article III,

8    Judge.  I mean, I'm kidding.  That would be slicing the

9    onion very thin.

10             MR. COLLINS:  I think the administrative office of

11   US Courts covers both the Bankruptcy Court Judges and the

12   District Court Judges.  I think would approach it -- even if

13   I don't succeed under the Constitution, I would approach it

14   through that statutory regime, your Honor.

15             THE COURT:  We both get our paychecks from the

16   federal government.

17              I mean, I think this is between the extremes.

18   It's not, you know, two random frauds that have nothing in

19   common.  False statements to courts are common to the two,

20   but it's not the situation that other courts have found to

21   pass muster under Rule 8 either where there was some

22   connection between the false statement and the underlying

23   crime either that the false statement was covering up that

24   crime or the false statement arose from the operation of the

25   same business.  And Judge Robinson in the *Kerik* case, which

1   I printed, does a fairly thorough analysis, and he says, let

2   me find it, he says that the government is always quoting

3   *Ruiz* and arguing that, as long as it involves substantial

4   alleged dishonesty, that's enough.  But Judge Robinson

5   points out that the charges in *Ruiz* were more closely

6   regulated than those in the *Kerik* case because they arose

7   out of business dealings with a particular company.  And in

8   the *Kerik* case he severed tax, this is painted with a

9   broader brush than the facts warrant, but basically Judge

10  Robinson severed personal tax machinations from honest

11  services fraud, and he basically says, you know, the

12  Indictment's a laundry list of illegal schemes and false

13  statements, the charges aren't related to all the others by

14  time, actors, places or subject matters.  The lone common

15  link is the defendant himself, like an unpleasant episode of

16  *This is Your Life*.

17          So the fact that it's the same defendant and it's

18  the same kind of bad behavior, in other words, dishonest

19  behavior, is not enough.  Here you've got a little more in

20  that it's not just generally dishonest behavior you're

21  alleging, it's dishonest behavior accomplished by making

22  false statements to federal courts.  So I think you're in a

23  slightly stronger position than in *Kerik* where the false

24  statements were made to City authorities, to the White

25  House, to the IRS, but you're not in as strong a position as

 1   you would be if there were some substantive relationship

 2   between the conduct.  I mean, the false statements in Counts

 3   One through Four and Count Six and Count Seven also were

 4   false statements that the defendant is alleged to have

 5   engineered, although they were ostensively made by the

 6   clients.  And here the false statement is his.  But aside

 7   from a "but for" connection, or, you know a connection you

 8   could have charged but you didn't, there isn't as much of a

 9   connection as in -- even as there was in *Josephberg* and that

10   was I think pretty much the outer limits of what would be

11   okay under *Ruiz*.

12          I also found a Seventh Circuit case called

13   *Alexander*, which is even more of a stretch, this is not a

14   good case for the defendant.  It was reviewed under the

15   plain error standard, which is not what I'm applying here,

16   obviously, but in the *Alexander* case, which is 135 F.3d 470,

17   the defendant had a business filing bankruptcies for people

18   and there were four counts arising from false statements,

19   and there are counts arising from his having defrauded his

20   customers and made false statements to the Bankruptcy Court.

21   Then there was a mail fraud count arising from a false

22   insurance claim on the business's insurance where the guy

23   falsely claimed that his business computer had been

24   destroyed in an accident.  There was a mail fraud claim

25   arising from a false mortgage application for a building

1   that contained the defendant's apartment out of which he ran

2   the business, and there were seven counts of bankruptcy

3   fraud relating to the defendant's personal bankruptcy, and

4   the Seventh Circuit said it was fine to have them all

5   together, not just because it was dishonest behavior by the

6   same guy, but they said, and I think this is a stretch, that

7   all of these offenses were designed to enhance the resources

8   of the filing business.  So the mortgage fraud got the

9   defendant the apartment out of which he ran the business.

10   The bankruptcy fraud arose from the operation of the

11   business.  The insurance fraud was an attempt to get money

12   for the business, I didn't really see that, it seemed like

13   it was an attempt to get money, and the personal bankruptcy

14   fraud, their argument was that, well, those false statements

15   prevented foreclosure of the premises out of which he ran

16   the business, which I think is weak, but which I think is

17   stronger is that in his personal bankruptcy he made false

18   statements that concealed the existence of the filing

19   business.

20          So particularly the false mortgage application

21   seemed like a real stretch to me, but it was under the plain

22   error standard.  I'm not under the plain error standard.

23   And the Seventh Circuit in *Alexander* cited a bunch of

24   out-of-circuit cases where the various frauds grew out of

25   the same business, and they said, well, this all has to do

 1    with the same business.

 2              Can I say that here, Mr. Collins, can I say the

 3    financial affidavit was part of the business?  I don't think

 4    I can.  And do I have to?

 5              MR. COLLINS:  With regard to, related to running

 6    the business, your Honor, I would say, no, but you don't

 7    need to, our position under Rule 8 is that you don't need to

 8    find that his perjury, that his perjury was related to the

 9    operation of Revelations.

10              I understand your Honor's point.  I mean,

11    obviously, there are always going to be differences between

12    different counts.  Our position is that under *Ruiz*, as your

13    Honor has cited, and with regard to it being of the same or

14    similar character, that we honestly can see no difference

15    between a lie to a United States District Judge during the

16    course of a litigation and a lie to a United States

17    Bankruptcy Judge during the course of litigation.  I can't

18    honestly see how those are not of the same or similar

19    character.  They strike the government as literally of the

20    same offense, except one is charged under 1001 and one

21    charged under 1623, both have essentially the same elements,

22    with the exception that under perjury it's made under oath,

23    while under a 1001 it's also a false statement and it's a

24    statement that's material.

25              I mean, the only difference between the two, the

1  only difference between the two counts in this case is that

2  1623 requires that it be under oath, which 1001 doesn't.

3  Other than that, they're both false statements to federal

4  judges in the same judicial district made during the course

5  of litigation.

6          THE COURT:  I mean, they're certainly of similar

7  character in the colloquial sense, but it seems to me the

8  case law, because similar character is sort of the thinnest

9  read under Rule 8(a), tends to frown upon describing the

10 offenses at such a general level of abstraction that, you

11 know, they're similar, just because they involve dishonesty

12 to make money or dishonesty to defraud, and they require

13 something more than what *Ruiz* said, they required something

14 more than substantial alleged dishonesty.  Even *Ruiz* didn't

15 say that that was enough.  *Ruiz* said, the false loan

16 application and the perjury before the Grand Jury were

17 properly joined as offenses of similar character because

18 both involved substantial alleged dishonesty and both arose

19 from the defendant's activities through this particular

20 entity called Alliance.  The false loan applications were

21 for projects that Alliance was attempting to do, and the

22 perjury before the Grand Jury had to do with whether the

23 state senate ethics committee had approved the defendant's

24 activities in connection with that entity.  So it wasn't

25 just, even under *Ruiz*, substantial alleged dishonesty, it

1    was substantial alleged dishonesty and that the counts both

2    arose from activities in connection with the same entity.

3              MR. COLLINS:  Well, but I guess that brings us

4    back to where we were before.  I mean, essentially that goes

5    back to your Honor's "but for."  But for the individuals

6    being involved in the bank robbery, they wouldn't be

7    testifying before the Grand Jury.

8              THE COURT:  Right, but it's more than that.  The

9    false testimony in the Grand Jury was designed the cover up

10   the bank robbery.  I mean, but for a million things.  If

11   Bank Robber One had been, not in the bar the night that Bank

12   Robber Two was there, they never would have met and never

13   would have done the bank robbery.  You can do a "but for"

14   analysis at a very general level of abstraction too.

15             Let me ask Ms. Attias, though:  Isn't the

16   government right?

17             I mean, these are false statements to the Court,

18   how can that not be of similar character?

19             MS. ATTIAS:  I was waiting to speak, Judge,

20   because you were making all my arguments, and I thought I

21   was doing quite well.

22             THE COURT:  But the hardest one is the one I just

23   asked you.  How can I say they're not of similar character?

24   It's lying to a Court, allegedly.

25             MS. ATTIAS:  Judge, where I think you have to put

1   your focus is on what the alleged lies were really about

2   really underneath.  All the other lies alleged in the

3   Indictment have to do with the business; the running of the

4   business, the alleged lying to the Bankruptcy Judge herself

5   was all about the running of the business, that's how the

6   business allegedly ran.  This was completely separate in

7   time.  This had a completely different purpose.  This was

8   for having had two different attorneys before.  The

9   allegations in this count have to do with getting a lawyer

10  without spending more money having had a massive change,

11  Mr. Bartok having gone through a massive financial change

12  over the time that the case was pending.

13          So, even if you even look at the reasons, the

14  potential reasons behind the alleged untruths, it shows how

15  completely unrelated they are.  Many of them, all of them in

16  the Indictment allege, have to do with his making money.

17  After he lost all that money during the course of the case,

18  now he came to the point where he was applying to the Court

19  for counsel that he didn't have to pay for, so that he

20  wouldn't have to spend whatever he had left on new counsel.

21          So that's my answer to that, Judge.  I don't think

22  that they are related.  I think that Mr. Collins's argument

23  is way too simplified.

24          THE COURT:  You know, I had a case years ago in

25  which the defendant was charged with commercial loan fraud,

1    he made false statements to a bank in connection with a real

2    estate project, and then, this is when I was on Team

3    America, we learned that he had made false statements in

4    connection with some personal loan applications and added

5    those counts to the Indictment.  And as I sit here, I can't

6    remember if there was a severance motion, but since Judge

7    Briccetti was representing the guy, I'm pretty sure there

8    was, and Judge Parker, who is now on the Circuit and

9    therefore we know is very smart, kept it all together.  And

10   I think it was a very simple argument:  False statements to

11   a bank to get a loan, it's of similar character, even though

12   one was business and one was personal.  So why isn't the

13   same true here?  False statements to a Court for the

14   personal advantage even though one was business and one was

15   personal.

16          MS. ATTIAS:  Judge, they, of course, that's the

17   underlying theme, is that they're all false statements to a

18   Court for personal advantage.  I don't know a client of mine

19   ever in 20 and a half years didn't do something for his

20   personal advantage, unless it happened to be a violent crime

21   of passion.  Other than that, I can't really remember any.

22          So I think that connection, just allegedly making

23   false statements to benefit himself financially, whether he

24   was not spending or making, I just --

25          THE COURT:  Making false statements to a Court --

1            MS. ATTIAS:  Right.

2            THE COURT:  -- just like making false loan

3     applications to a bank.

4            MS. ATTIAS:  Judge, I think it's not enough.  I

5     obviously don't dispute that connection between the charges

6     but I think it's not enough.  And that brings us back to

7     something you said at the very beginning of this morning's

8     conference, which is, in terms of cleanly trying the

9     underlying counts, this makes it potentially messy.  Since

10    there's going to have to be another trial on the contempt,

11    then you know we're not even really wasting court resources

12    if the two were tried together, and although the record

13    could be cleared as much as possible so that it was clear to

14    the jury that it was not this Court that he allegedly lied

15    to, it's kind of hard to know that that's going to go really

16    well and at some point -- I mean, I'm sure that, even if we

17    just say "The Judge, The Judge, The Judge," they're going to

18    be kind of wondering why the judge has no name, and I just

19    think that on the most practical level, as long as there has

20    to be another trial, why not spend another five hours on the

21    perjury count and have one clean trial on the underlying

22    crimes and a clean trial on the other count?

23            And I have to tell you that before we go much

24    further, I just have to bring up one subject about dates of

25    trials based on some new information I learned yesterday

1   morning and confirmed yesterday evening, and that sort of,

2   the reason I bring it up now, as I stand here cringing, is I

3   believe that we can still try a case on May 21, but I now,

4   as of yesterday evening's confirmation of some information

5   Mr. Collins shared with me yesterday morning, I do not

6   believe that it can be the underlying crime portion of the

7   case, and I'll tell you why.

8          Mr. Collins has been very cooperative, we've had a

9   very good working relationship throughout the course of the

10  very few months that I've had this case, and yesterday

11  morning, just in a long conversation, amongst other things

12  he said, by the way, do you know about those massive number

13  of boxes from when Mr. Bartok's office was originally

14  searched in 2010 before there were any criminal charges

15  brought?

16         And I said, excuse me?  No.  Don't know anything

17  about this.

18         Apparently when Inspector Marsh searched his

19  office, they seized a large part of the contents of his

20  office, files, anything down to phone messages, basically

21  everything.  Then David Wikstrom, Mr. Bartok's first

22  attorney, arranged with the government to have everything

23  copied at huge expense, in the area of $10,000, in August of

24  2010.

25         At first Mr. Collins thought, his memory, I'm glad

1    it was incorrect, there were 52 boxes.  Mr. Turk tells me

2    this morning there were 32 boxes.

3              THE COURT:  Mr. Wikstrom had them copied?

4              MS. ATTIAS:  Had them copied.

5              THE COURT:  So where are they?

6              MS. ATTIAS:  Fifteen boxes were returned to

7    Mr. Bartok sometime in August of 2010, but as of this

8    morning, Mr. Bartok, this is the first time when I went down

9    to the Marshal's office since I spoke to Mr. Wikstrom last

10   night at about eight o'clock, this morning when he came into

11   the building at about 9:15 to 9:20, I went downstairs and

12   spoke to him.  He does not, at this time, have any idea

13   where those boxes are.  He does not have a clear memory of

14   the boxes being returned.  I have not yet had the

15   opportunity to speak to Mrs. Bartok to see if she knows

16   where the boxes are.

17             THE COURT:  I'm confused.  Mr. Wikstrom had 32

18   boxes copied and he said he gave 15 to Mr. Bartok.

19             MS. ATTIAS:  Yes.

20             THE COURT:  Where are the other 17?

21             MS. ATTIAS:  I don't know.  What he told me last

22   night on the phone is that there was a ton of material

23   seized, and he returned some of it to Mr. Bartok.  Now I do

24   believe that there are two copies, and this is just from

25   this morning speaking to Mr. Collins, Inspector Marsh may

1    have the originals that were seized and --

2               THE COURT:  I hope he does.

3               MS. ATTIAS:  And the government appears to have a

4    copy in the basement of this building.  So, whether or not I

5    can locate those boxes -- make believe I can get them this

6    afternoon, 32 boxes, even make believe it was 15 boxes, on

7    top of what I'm dealing with now, Judge, makes for a very

8    ineffective defense in five weeks.

9               THE COURT:  Depends what's in them.

10              MS. ATTIAS:  But how does one --

11              THE COURT:  If 28 of them are clients who aren't

12   going to be part of this case, could be files going back

13   years that aren't covered by this case.

14              MS. ATTIAS:  A lot of them could be absolute

15   garbage, but until I look at them, I don't know.  And if the

16   government has them, I need to have them and look at them.

17   So here's --

18              THE COURT:  Well, look, you know my schedule.

19   You've got a detained client.  If we don't do this May 21,

20   time I have put aside for a long time, I don't know when the

21   hell we're going to be able to do it.  If it's a three-day

22   drug case, I can get somebody else to take it.  Nobody see

23   taking a three-week fraud case.

24              So, before freaking out, I think the first thing

25   is somebody has to get you to those boxes.  If they're in

 1   this building or in Mr. Marsh's office, that should be

 2   doable as soon as you have the time.

 3          And does Mr. Collins or Mr. Alberts have any idea

 4   what's in them?

 5          MR. COLLINS:  I do.  So, just so I understand,

 6   have we moved away now from the severance argument to

 7   discovery issues or do I get to go back?

 8          MS. ATTIAS:  Well, I just want to --

 9          THE COURT:  You get to go back to.  Well, let me

10   just say, going back to severance, even if I severed Count

11   Eight, I might very well let it in under 404(b).  So, I

12   don't know that the efficiency argument is furthered.  I

13   also don't know that I would let it in under 404(b), it

14   would depend somewhat on what the defense is in this case,

15   and I don't know what it is.  But I don't want either side

16   to think that even if I, that if I sever, that presages what

17   I would do under 404(b).

18          Let us assume for the remainder of this severance

19   argument that these boxes will end up being not important or

20   something that you can get through in the next six weeks.

21          MS. ATTIAS:  This is what begs the question.  They

22   may be nothing, but somebody has to look at them and

23   somebody has to prepare this case for trial and somebody has

24   to do all of the written submissions before trial, and you

25   might notice that I am standing here alone at counsel table.

1  My downtown office appears to have some staffing

2  complications, and all I can say about that is I am

3  currently alone on this case.

4           THE COURT:  No, I get that.

5           MS. ATTIAS:  So even --

6           THE COURT:  Let's finish talking about the

7  severance, and we'll talk about the -- if I understand what

8  you were going to propose, you were going to propose the

9  Count Eight and Ten trial from May 21 and the big trial for

10 some other time.

11          MS. ATTIAS:  This is why we get along, Judge.  One

12 of the many reasons.

13          THE COURT:  But is there anything more you want to

14 say on the legal point of whether Count Eight is properly

15 charged?

16          MS. ATTIAS:  No, I think I said everything I have

17 to.

18          THE COURT:  Mr. Collins, do you want to say

19 anything more about Count Eight?

20          MR. COLLINS:  Very briefly, your Honor.  I think

21 one of the points was the one you alluded to, which is, I

22 don't think there's any savings of judicial efficiency

23 because we would strongly believe that, even if Count Eight

24 was severed -- and still with regard to Count Ten, with

25 regard to Count Ten, as I've made clear to Ms. Attias, our

 1    intention is to offer that evidence under 404(b), as we set

 2    forth in the brief, and the same with regard to Count Ten --

 3    to Count Eight.

 4              THE COURT:  What is the your theory, the 404(b)

 5    theory?

 6              MR. COLLINS:  With regard to Count Eight or Count

 7    Ten?

 8              THE COURT:  Either.

 9              MR. COLLINS:  With regard to Count Eight, Count

10    Eight is set forth in the brief is that my understanding, at

11    least my understanding as of now, is that intent or

12    knowledge or absence of mistake is going to be is a issue at

13    trial and, therefore, as a result, the fact that, as charged

14    in the Indictment, specifically as we've talked about

15    previously that, with regard to Count Six, that Mr. Bartok

16    made false statements to the Court, it's highly relevant

17    that with regard to Count Eight that, as said beforehand, I

18    don't mean to repeat myself, that there are false statements

19    made to another federal judge.

20              And, in addition, going back to the only other

21    point I want to cover with regard to Ms. Attias made,

22    Ms. Attias seemed to draw a very fine line between that

23    Mr. Bartok's frauds were for his personal advantage but

24    Count Eight was for the minimization of payments.

25              THE COURT:  I think she was saying it doesn't

1    matter, every fraud is to benefit the fraudster, so I

2    shouldn't draw that distinction.  I think that's what she

3    was saying.

4            MR. COLLINS:  But that's the point.  And that goes

5    to -- and not to say that Ms. Attias's actually made the

6    Government's point, but in an indirect way she actually did

7    because, again, they are two, they're both frauds.

8    Mr. Bartok's initial frauds as charged in the Indictment,

9    and a fraud upon the Bankruptcy Court and a fraud upon the

10   Court in order to gain personal advantage.

11           THE COURT:  That's clearly not enough.  I know

12   *Ruiz* uses that phrase, "substantial alleged dishonesty," but

13   that is clearly not enough.  Two unrelated frauds having in

14   common only the defendant being the perpetrator I don't

15   think are properly joined under Rule 8(a).  There needs to

16   be some additional connection.  And the question in my

17   mind -- even under *Ruiz*, that would not fly.  Just like it

18   didn't fly under *Kerik*.

19           The question is, does the fact that these frauds

20   were perpetrated using the same means, false statements to

21   federal courts, give you the something extra or does the

22   something extra have to be what it was in *Ruiz* and *Werner*

23   and *Josephberg* and the cases the defendant cites, which is

24   the two frauds arose out of the same entity or the same

25   scheme with some other connection, or is it enough that it's

1    the same kind of fraud, such as it was enough that it was a

2    false statement to a bank for a commercial loan and a false

3    statement to a different bank for a personal loan or that

4    somebody committed income tax fraud by underreporting their

5    income and they also did it by inflating their expenses?

6    That's the question.

7             MR. COLLINS:  Same kind of fraud committed against

8    the same entity, the United States Courts, United States

9    Judges, by the same individual.  Rule 8 is not about drawing

10   exceedingly fine lines, it's why the rule, it's why *Ruiz*

11   uses the term "substantial alleged dishonesty" and Rule 8

12   itself, the statutory language, is same or similar

13   character.

14            Clearly, again, your Honor, if somebody was to, if

15   somebody was to walk down Main Street in White Plains and

16   they were to rob the Citibank across from the Wal-Mart on

17   April 5th, today, and two months later they were to go one

18   block away to rob the Chase Bank, which is a block away,

19   it's the same crime, it's bank robbery, it's the same

20   victim, it's the FDIC.  It shouldn't make a difference that

21   it's a different financial institution or that in one

22   instance that the person may have claimed that they have a

23   bomb, the defendant may have claimed they have a bomb or

24   another instance he may have shown the toy pistol.  Just

25   because there are differences between the crimes committed

1   on different days, there's timing differences, in that

2   instance, it's essentially the same crime, perhaps committed

3   by a different means against the same type of entity.  No

4   different than what occurred here.

5            THE COURT:  Do you think if you had the Madoff

6   case and you learned that Madoff, in addition to everything

7   else, was paying his nanny off the books, that you could

8   join the nanny tax with the Ponzi scheme?

9            That's the sort of question a Second Circuit Judge

10  would ask.  I don't usually do that, but I'm actually

11  curious to know the answer.

12           MR. COLLINS:  It is, and I'm glad I'm neither

13  Mr. Litt nor Ms. Baroni.

14           Well -- I'm sorry, but those are two -- the nanny,

15  I'm sorry the nanny tax and the securities fraud is what

16  you're --

17           MS. ATTIAS:  Do you want me to draw you a picture?

18           MR. COLLINS:  I understand your Honor's question

19  but that's -- unfortunately, your Honor, while I understand

20  the question and the hypothetical, to use an old phrase,

21  that's not what's going on here.

22           THE COURT:  All right, let me change it.  Let me

23  change it.  You have Madoff, he's running a huge Ponzi

24  scheme and he's also, for the employees of that business,

25  he's not paying the proper payroll tax.

1          MR. COLLINS:  Yes, because that was essentially,

2    that was the same --

3          THE COURT:  It's from the same company, right.

4          MR. COLLINS:  That was the same, that's the case I

5    tried before Judge Preska in which there was a bank fraud

6    involving Tollman-Hundley hotels, and it turned out that the

7    entity was committing tax fraud by not properly paying its

8    payroll taxes, so I most assuredly say, yes.

9          THE COURT:  Right.  And our case is somewhere

10   between the two examples I just raised; right?  Because it's

11   not 100 percent unrelated as in the first example in that it

12   has the similarity -- well, I take it back.  It's

13   100 percent unrelated as in the first example in that the

14   lie on the financial affidavit didn't further the business

15   in the least, but there's a similarity in that here it is an

16   unrelated lie but it is a lie involving -- it is a very

17   similar, it has a very similar character in that it is a lie

18   to a Court.  So it kind of comes down to whether similar

19   character means just the means of committing the offense or

20   if it means the purpose of the offense.  It's not all that

21   clear.

22         MS. ATTIAS:  Judge, I already sort of said this,

23   but I think, as I was writing the motion, I saw that

24   obviously the two counts felt quite different in terms of

25   the severance argument, but if it's really not that clear,

1    then why muddy a trial?  And I just don't see the practical

2    purpose for going there, and I think that that's very

3    important.

4              And, in fact, under Mr. Collins's advising the

5    Court, and of course he and I have already begun to discuss

6    this, that he'll be moving for the information to come in

7    under 404(b) anyway, I'm not so sure it is admissible.  It

8    might be so closely related that it really shouldn't be

9    admitted, but you know it might be too closely related and

10   muddy things even further.

11             THE COURT:  Well, that would cut the other way.

12             MR. COLLINS:  I --

13             THE COURT:  Look, even the *Werner* case, which is a

14   very good case for the government because it sort of undid a

15   lot of the damage that the *Halpert* case did to the

16   government.  Even in *Werner* they do say, similar character

17   means a general likeness, but then they go on to say, while

18   the stolen property offense and the robbery offense were of

19   similar character, they say, well, they both arose from the

20   defendant's position as an insider at the Lufthansa

21   terminal, and the defendant was emboldened by his successful

22   theft to get involved in the robbery.  So even there where

23   they're saying similar character just means general

24   likeness, they go on to discuss the existence of a

25   substantive connection beyond just the means.  If it were

1  enough that both were property being taken, if it were

2  enough to be of similar character, one was a robbery, one

3  was a theft, property were being taken, they wouldn't have

4  bothered saying both arose from a defendant being an insider

5  who worked at the Lufthansa terminal.

6      And in *Ruiz*, if it was enough that the false loan

7  application and the perjury both involved false statements,

8  they wouldn't have said both involved false statements and

9  arose from the operation of the same entity.

10      So although I agree that there's something bizarre

11  about the notion that a false statement to the District

12  Court and the false statement to the Bankruptcy Court

13  wouldn't be of similar character, it seems like all the

14  cases that discuss similar character regard it as being

15  something more than just a similar means, they look for some

16  substantive question, even that Seventh Circuit case,

17  *Alexander*, they tied themselves in knots to say, well, the

18  false statement on the mortgage application and the false

19  statements in the bankruptcy kept him in the apartment out

20  of which he was running the other scheme.  If it was enough

21  that they were false statement crimes, the Seventh Circuit

22  wouldn't have had to tie itself up in knots.

23      So even though I think it's by no means clear, I'm

24  going to grant the motion to sever Count Eight as well, and

25  I will absolutely consider any 404(b) application, and so

1    this may end up having little practical effect; but I think

2    under the law I have to look at Rule 8 and whether

3    something's properly joined without considering whether it

4    might be admissible under 404(b).  I think it's similar

5    enough to be admitted under 404(b), but I don't know that

6    the standards under 404(b) and Rule 8(a) are the same.  And

7    I don't have a good enough feeling as to what the defense is

8    going to be in this case to know whether I'll admit under

9    404(b), and if I do, and if that's the right decision --

10   well, if I had denied this motion, on appeal the government

11   would argue, well, it would have come in under 404(b) anyway

12   and it's harmless, but I don't know if it's coming in under

13   404(b), and I'm not doing a harmless error analysis, I'm

14   just looking at Rule 8.  So that's my ruling.

15          I will add that the recusal motion the government

16   consents to in part and consents to it for Count Ten.  As to

17   Count Eight, it's meritless.  The government correctly sets

18   forth the legal standards.  My views and the comments to

19   which defense counsel cites all arose from court

20   proceedings.  There's nothing extrajudicial that I know

21   about Mr. Bartok.  So what I have observed in Court is not a

22   proper basis for recusal.  And, in any event, I don't think

23   any reasonable informed person would find my comments

24   sufficient to raise significant doubt as to my impartiality

25   given the record before me when I made the comments and the

1   fact that the Court of Appeals recently affirmed my ruling

2   revoking Mr. Bartok's bail, and that they did that having

3   reviewed the transcript and apparently not finding any

4   problem, I think a reasonable person would not find that my

5   action in revoking the bail or what I said about it to be

6   evidence of bias or lack of impartiality.

7           As a practical matter, however, if Count Eight is

8   going to be tried with Count Ten and Count Ten is going to

9   be tried by another judge, it doesn't make sense, and that

10  judge can't be me, it doesn't make sense to have separate

11  trials on Count Eight and Count Ten.  So it may end up being

12  that Mr. Bartok gets another judge for both Counts Eight and

13  Ten just because that's practical.

14          Now going back to discovery.  Tell me what you

15  know about these boxes, Mr. Collins.

16          MR. COLLINS:  Yes, your Honor.  The boxes, the

17  boxes were first mentioned in the very first discovery

18  letter, and as Ms. Attias says, they were copied by his

19  prior counsel a couple generations ago.  As to what has

20  happened with Mr. Bartok's set, I rely upon what Ms. Attias

21  says.

22          THE COURT:  Let me interrupt one second.

23  Mr. Wikstrom was retained?

24          MR. COLLINS:  He was retained.

25          THE COURT:  So he had this very expensive copying

 1    job done and now we're not sure where the boxes are.  That's

 2    great.  Go ahead.

 3              MR. COLLINS:  I apologize, your Honor.

 4              THE COURT:  No, I interrupted you.

 5              MR. COLLINS:  I don't have any information on that

 6    other than what Ms. Attias has said.

 7              We have the originals, as Ms. Attias indicated,

 8    and we also have our working copy, which is in the basement.

 9    And subject to both sides trying to get done what they need

10    to get done, we would obviously make the working copies, the

11    working copies available.

12              That being said, it's not our present intention to

13    use -- we'll be using some documents, some of the documents,

14    your Honor.

15              THE COURT:  Can you give us a general idea of what

16    those documents consist of?

17              MR. COLLINS:  Customer files, bank records and

18    court filings.

19              THE COURT:  And have you identified for the

20    defense what clients are going to be the subject of

21    testimony at trial?

22              MR. COLLINS:  Yes.  We've identified, well, we've

23    identified clients -- we've identified the individuals, all

24    of the individuals in the Indictment.

25              THE COURT:  And are you going to be proving up

1   clients beyond the ones discussed in the Indictment?

2           MR. COLLINS:  We may be dealing, your Honor, with

3   other filings that are problematic.  As I've done with

4   Ms. Attias, I've been very proactive in terms of identifying

5   issues.

6           THE COURT:  Well, if you, I mean, let's say there

7   are, I'm making this up, I don't know, there are six clients

8   identified in the Indictment; is that right?

9           MR. COLLINS:  Eight.

10          THE COURT:  Eight.  All right.

11          MR. COLLINS:  Seven and one potential client.

12          THE COURT:  And she knows who those eight are?

13          MR. COLLINS:  She does.

14          THE COURT:  But if you're going to be proving up

15  either additional clients or through a summary witness

16  saying, I went through 100 files and in 66 of them I found

17  X, you need to tell her those specifics as well if you

18  expect her to be ready by May 21.

19          MR. COLLINS:  We do expect summary testimony.  We

20  do expect summary testimony based upon the payment cards of

21  Revelations showing the money that's going in, but obviously

22  with regard to a summary witness, it's not only the charts

23  but the underlying documents that we would have to mark.  So

24  we would be obviously letting her know that.

25          THE COURT:  Well, I guess I'm a little confused

1   now.  Are you going to be having some sort of summary

2   witness who's going to talk about large numbers of clients?

3                  MR. COLLINS:  Not the filing details or

4   Mr. Bartok's conversations with them, but with regard to

5   what the payment cards show, what the business records of

6   Revelations show as to what Revelations was taking in during

7   specified periods of time.

8                  THE COURT:  Well, if you're not proving that there

9   was anything fraudulent, let's say you have a chart with 200

10  customers, if you're only proving that eight of them are

11  frauds, then what's the relevance of the other 192?

12                 MR. COLLINS:  Because we expect there will be

13  testimony from individuals that worked at Revelations.

14                 THE COURT:  That the whole thing, that everybody

15  was a fraud, it was saturated with fraud?

16                 MR. COLLINS:  That it was saturated with fraud,

17  your Honor.

18                 THE COURT:  And this evidence is going to come not

19  from the individual client files but from some other payment

20  records?

21                 MR. COLLINS:  Well, there will be the payment

22  records.  Revelations kept essentially index cards that

23  showed the amount of money that individuals were paying for

24  services both as an initial fee and as monthly, and as

25  monthly installments until an individual was no longer with

1    Revelations.

2           THE COURT:  And are those index cards in the

3    individual client file?

4           MR. COLLINS:  No.

5           THE COURT:  So --

6           MR. COLLINS:  They were kept, my understanding is

7    they were kept separately essentially in a safe.

8           THE COURT:  So Ms. Attias can just look at those

9    underlying records and compare it to your chart, she doesn't

10   need to go into the individual client files to do that?

11          MS. ATTIAS:  Well, Judge, I mean, this brings

12   me --

13          THE COURT:  That doesn't mean that you wouldn't

14   want to.

15          MR. COLLINS:  But those, and just to go back, the

16   payment cards have already been provided in discovery, so I

17   don't think we're actually talking -- if we're still talking

18   about the boxes, then I don't believe that we're actually

19   talking about something that Ms. Attias has to investigate

20   anew by going to the boxes because it's already part of the

21   discovery provided.

22          THE COURT:  But, you know, she's trying to do her

23   homework and --

24          MR. COLLINS:  Of course.

25          THE COURT:  -- she thinks she needs to go through

1  the boxes.

2          Here's what I want to do.  I'm extremely reluctant

3  to move this trial just because --

4          MS. ATTIAS:  Just because 32 boxes appeared

5  yesterday?

6          THE COURT:  Just because the next available time I

7  have is a year from now, and I don't want Mr. Bartok sitting

8  in the pokey for a year.  And that's literally.  Because I

9  have a trial April 23, then I have this one.  The moment

10  this one is over, I have what is billed as an eight-week

11  trial, maybe it will end up being shorter.  The moment

12  that's over, I have a one-week trial.  Then I'm trying to

13  take a week or two off.  Then right after Labor Day, I have

14  a four-week trial, immediately followed by a three-week

15  trial, immediately followed by a five-week trial,

16  immediately followed by a two-to-four month trial in January

17  of 2013.

18          The only possibility I would have is, and those

19  are all criminal except for a five-week civil trial in

20  November, so if I had to, I would put this case in there.

21  It's going to be very hard to find somebody who could try

22  this case in my place, although, if need be, I will do it,

23  but I'm not going to move anything yet.

24          The government should make the boxes available to

25  Ms. Attias right away.  And, Ms. Attias, as soon as you have

1  a moment, go down and look at those boxes.  Maybe when you

2  see them, you will conclude that there's really only three

3  or four that are going to be relevant or that you don't need

4  to go through the client file for every single, solitary

5  client.  But, if you come back and you say you do, we'll

6  figure something out then.

7          So let's come back in whatever timeframe you think

8  is reasonable for you to be able to tell me that you've

9  flipped through those boxes and you have a sense of what's

10  in them and what you need to do.

11          MS. ATTIAS:  Judge, I am not working tomorrow and

12  Monday, so we can perhaps, I don't know, I have another plea

13  before you this afternoon, but perhaps, you know, for a hour

14  I can start going downstairs now, and I can resume on

15  Tuesday.  I can probably report in to you just from within

16  literally a hour downstairs in the basement just looking at

17  them, opening up the first ten boxes, I can probably get

18  some clue.  If I can tell you by the middle of next week, if

19  I'm back in the office on Tuesday, which I am, I can

20  probably tell you by Wednesday.

21          THE COURT:  I'm not here next week Wednesday

22  through Friday, so what about --

23          MS. ATTIAS:  Can I have just a second, Judge?

24          THE COURT:  Yes.

25          (Counsel confer)

1          THE COURT:  I was going to suggest also that maybe

2     Mr. Burke could be your tour guide through the boxes since

3     he seems to be the one who knows what's in them.

4          MS. ATTIAS:  That would be lovely, Judge, and I

5     don't have a plea till 2:45 in a case with you.  I am

6     willing to spend the next the hours looking at the boxes.

7          THE COURT:  That would be great.

8          MS. ATTIAS:  We can maybe put this on for second

9     call.  Believe me, if there's a way I can try this, I would

10    like to get this done.  I know that he's incarcerated, and

11    everybody has been putting a lot of time in, but I need to

12    do the right job.

13         THE COURT:  I agree with everything you just said,

14    and if it turns out that either I have to move my civil case

15    for November or I have to find some saint of a senior judge

16    or somebody to help me out, I will.

17         MS. ATTIAS:  There was also that, of course, that

18    little funky idea of trying the cases backwards.  It might

19    feel backwards, but perhaps it's not backwards, I don't

20    know.  But just another option.  But I think that if I came

21    back before you, either just before my plea at 2:45 or just

22    after that, I could tell you where things stand.

23         THE COURT:  Let me ask Ms. Cama what else we have

24    this afternoon.

25         MR. COLLINS:  Can I just go back?  I'm not -- just

1    so I understand it, trying them in reverse actually doesn't

2    involve --

3              THE COURT:  Doesn't involve me.

4              MS. ATTIAS:  Right.

5              MR. COLLINS:  So I'm not sure it actually involves

6    your schedule.

7              THE COURT:  Right.  Well, the government can think

8    about whether it wants to try them backwards.  I will leave

9    it up to the government which set of charges it wants to go

10   first.

11             All right.  So why don't we reconvene at 3:15 and

12   I'll get a better feel.

13             MR. COLLINS:  Your Honor, I apologize,

14   unfortunately, is it okay if just Mr. Alberts appears for

15   the government?

16             THE COURT:  Of course.

17             MR. COLLINS:  Thank you.  And we've had some time

18   to contemplate your Honor's question, and our preference is

19   the fraud trial go first.

20             THE COURT:  I'm shocked.

21             MS. ATTIAS:  Judge, so we've concluded all the

22   business that we've taken up so far this morning?

23             THE COURT:  Yes.

24             MS. ATTIAS:  There's a little bit more.

25             THE COURT:  Okay.

 1              MS. ATTIAS:  But, I'm sorry, before we do that, I

 2    was trying to understand your actual ruling on the recusal

 3    motion as to Count Eight.  I understand everything you said

 4    about of course you can be impartial, I just didn't quite --

 5    I was thinking that I hadn't quite heard a decision I

 6    thought.

 7              THE COURT:  The recusal motion is denied.  I don't

 8    think there's any legal basis for it.  My views arise all

 9    from in-court proceedings, and if they didn't, I don't think

10    my impartiality could reasonably be questioned; however, it

11    sounds like everybody agrees Eight and Ten should be tried

12    together, and Ten is going to be tried by somebody else.

13              So, as a practical matter, Eight will also be

14    tried by somebody else, not because there's any legal

15    requirement that that be done but just for the sake of

16    efficiency.

17              MS. ATTIAS:  That is what I thought I heard you

18    say.

19              THE COURT:  All right.  Anything more?

20              MS. ATTIAS:  Yes, Judge, I have left a message

21    for -- there's the issue of the car sale.

22              THE COURT:  Oh, the car, that's right.  The last I

23    heard, and we should make a record here.

24              Ms. Attias and I have actually spoken about the

25    car and some difficulty she was having in getting the CJA

1    office to take -- since the check was made out to

2    Mr. Bartok, my idea was to have him endorse it over to the

3    Clerk of the Court.  CJA people said they couldn't take a

4    check like that.  I asked if they would just this once, and

5    it turns out they can take the check.  That's where we left

6    it.

7              Do they have the check?

8              MS. ATTIAS:  They do not have the check, Judge.

9              THE COURT:  Where is the check?

10             MS. ATTIAS:  The check is on this table sitting

11   two inches away from me.

12             THE COURT:  And why is it still here?

13             MS. ATTIAS:  Because it has yet been unsigned with

14   that particular required endorsement over to the US Courts

15   Southern District of New York, as Tracy Miller, the CJA

16   clerk downtown, informed both your Honor and myself needed

17   to be.  I could not make it myself to Valhalla the other

18   day, so my assistant went over there with the check.

19   Mr. Bartok expressed some displeasure at having to sign the

20   check in such a manner.

21             I spoke to him this morning in the pens, and I do

22   not believe he is going to sign that check.  So I

23   therefore --

24             THE COURT:  Is there a reason?

25             MS. ATTIAS:  None that I can express to your

1   Honor.

2            THE COURT:  Does Mr. Bartok understand that that

3   refusal is likely to result in another contempt of court

4   charge?

5            MS. ATTIAS:  I haven't had that exact discussion

6   with him, but I do believe that he understands that that is

7   a possibility.

8            So, in an effort to practically get to the

9   solution required by your Honor's order, I have just before

10  I came up here this morning, I left a message for the car

11  dealer who I've been dealing with who has been very

12  cooperative, asking him to look into the possibility of

13  cutting a new check made out to the party that your Honor

14  has ordered that the money be paid to, that being the US

15  Courts, Southern District of New York.

16           The reason it was made, I actually had asked him

17  to do that initially, the reason it was made out to

18  Mr. Bartok was because Mr. Bartok was the owner of the car

19  and that's what the business needed to do.

20           My suggestion to him in that phone message, and

21  I'll find out what happens when I get downstairs, is perhaps

22  an order of the Court would be helpful in his boss's

23  decision about who to cut the check to.

24           THE COURT:  I'm going to order something, but it's

25  going to be different.  When we come back at 3:15, if that

1    check is not signed, I'm going to order Mr. Bartok to sign

2    it.  If he doesn't, he'll be in contempt of my order.

3         Now he's already in jail, so throwing him in jail

4    isn't going to have any coercive effect, and he doesn't have

5    any money, apparently, so fining him isn't going to have any

6    coercive effect, but I will hear from either side about what

7    punishment I could impose that might have some effect, and

8    it is certainly a matter that I would refer to the

9    US Attorney for prosecution if I make such an order and in

10   my presence Mr. Bartok refuses to sign it.

11        They obviously can charge him if they choose, but

12   you know, if he were at liberty, I would just throw him in

13   jail until he signed it.  But throwing him in jail won't do

14   any good here, obviously.

15        So I'll take the Government's advice on what sort

16   of sanction might make sense if Mr. Bartok refused.  But,

17   when we meet later, I'm going to order him to endorse the

18   check as described and if he doesn't --

19        MS. ATTIAS:  Judge, I don't think Mr. Collins is

20   going to need to do his research.  Mr. Bartok is endorsing

21   the check right now.

22        THE COURT:  That is wise.

23        MS. ATTIAS:  After he signs his name, Judge, right

24   in front of him I'm going to write out, which I did not want

25   to do before it was signed, I will write in the endorsement

1    "Pay to the Order of," as Ms. Miller --

2           THE COURT:  I think his signature needs to be

3    below that writing, so I don't know where he signed the

4    check, but he can sign it again below that writing, if need

5    be.

6           MS. ATTIAS:  You know, so far in this case I've

7    been a car dealer and now I'm a banker.  So can I have a

8    second, please just to take a look at this?

9           THE COURT:  Sure.

10          MS. ATTIAS:  I'm going to hand write it in, I'm

11   going to have him sign it again in two places.

12          THE COURT:  Sounds good.

13          (Pause)

14          MS. ATTIAS:  Your Honor, I am now prepared to put

15   the proverbial check in the mail.

16          THE COURT:  Excellent.  Glad that issue is off the

17   table.  The only dangling issue with respect to the money is

18   whether Mr. Till has, in fact, submitted his CJA voucher.

19          Do you know?

20          MS. ATTIAS:  I've been in touch with him.  I think

21   that what happened was that when he was asked by your Honor

22   to give a reckoning of the time that he had spent on the

23   case, he believed that was the CJA bill, from everything I

24   can see.

25          THE COURT:  So is he now going to --

1          MS. ATTIAS:  So his office is going to be dealing

2    with that.

3          THE COURT:  So he'll be submitting a voucher.

4          MS. ATTIAS:  As I understand, Judge.

5          THE COURT:  All right.  We will reconvene at 3:15,

6    and Ms. Attias, don't, I know you won't, but don't, don't

7    pull your punches about what you think the significance of

8    these boxes is just because it's a headache for me.

9          MS. ATTIAS:  I have no hesitation doing it.

10         THE COURT:  If you need the time, you tell me.

11         MS. ATTIAS:  Thank you.  You can join me in my

12   headache.  I bought a new bottle of aspirin in my office.

13         MR. COLLINS:  Before we actually go, I actually

14   have some minor housekeeping issues.

15         THE COURT:  Okay.  Also I should put on the record

16   that the co-defendants have been given permission not to

17   attend since the motions that were on for today involved the

18   S4 Indictment in which they were not named.

19         Okay, go ahead, Mr. Collins.

20         MR. COLLINS:  I think actually Ms. Attias realized

21   she had one more issue.

22         THE COURT:  Oh, okay.

23         MS. ATTIAS:  Back a while ago, when I first came

24   into the case in December, a question came up as to during

25   the filing of the last CJA-23 about whether or not

1    Mr. Bartok was yet receiving Social Security benefits.

2    Afterward I did speak to his office, and I learned that the

3    checks had just started to come over the last couple of

4    months.  So your Honor asked me to look into my office

5    policy about whether we would be looking to recover part of

6    the cost of representation through Social Security, and the

7    answer is, no, we are absolutely not looking to take away

8    his Social Security money.  Not a penny of it.

9            THE COURT:  How much is the Social Security?

10            MS. ATTIAS:  1350 to $1,400 a month, Judge.

11            THE COURT:  And is that his wife's only source of

12    income?

13            MS. ATTIAS:  She is working for two different

14    stores making I think minimum wage and working very long

15    hours.

16            THE COURT:  Like in retail?

17            MS. ATTIAS:  Yes.  Yes.

18            THE COURT:  All right.  I don't see any need to

19    order anything to be done with the $1,400 a month.

20            Does the government disagree?

21            MR. COLLINS:  No.

22            THE COURT:  All right.  Anything else from

23    defendant?

24            MS. ATTIAS:  No, Judge.

25            THE COURT:  Mr. Collins.

 1          MR. COLLINS:  Yes, your Honor, we would ask that

 2   your Honor set an acceptance of responsibility date.

 3          THE COURT:  Well, I'll do that when we have a

 4   trial date.

 5          MR. COLLINS:  I thought we had a trial date of

 6   May 21.  It hasn't been adjourned yet.

 7          THE COURT:  We do, but it might change at 3:15.

 8   So, if it doesn't, I will set an acceptance date at 3:15.

 9          MR. COLLINS:  Okay.  While I'm here, though,

10   proceeding on the assumption we are going to trial on

11   May 21, can I address two small issues?

12          THE COURT:  Okay.

13          MR. COLLINS:  The first is, it's my understanding

14   that your Honor often does not need sort of standard

15   requests to charge on standard charges.

16          THE COURT:  I don't, well, I mean, for the

17   offenses, yes, but you could just tell me, I want the charge

18   on similar acts, I want the charge on reasonable doubt.  I

19   don't need you to give me proposals on anything except the

20   substantive offenses and anything out of the ordinary you

21   would be asking for.

22          MR. COLLINS:  Okay.

23          MS. ATTIAS:  Judge, in that regard, would you,

24   depending when the trial date is, of course, would I be able

25   to have access to whatever reasonable doubt charge you give

1  and maybe a couple of particulars I'm not thinking of right

2  now?

3              THE COURT:  Sure, like from a previous trial?

4              MS. ATTIAS:  Yes.  If you give a standard

5  reasonable doubt charge.

6              THE COURT:  I think I give the one -- I think it's

7  right out of *Sand*, but, yes, that's no problem, you can ask

8  Mr. Levy.

9              MS. ATTIAS:  Great.

10             MR. COLLINS:  And, also, your Honor, does your

11  Honor normally sit from 9:30 to 2:00?

12             THE COURT:  Well, when it's a trial of this

13  length, I usually sit, I usually have the jury from 9:30 to

14  2:30, and I have counsel, if they have any issues, come at

15  9:00.

16             Let me ask Alice, though, are we planning to do

17  that for this trial?  Have you been putting things on, other

18  things from 3:30 to 5:00 starting May 21?

19             THE CLERK:  No, I've been doing the upside-down,

20  Judge, 9:30 to 2:30 trial.

21             THE COURT:  So that is what we will do.  So if

22  counsel have any issues, we do it between 9:00 and 9:30, and

23  we do 9:30 to 2:30 with a 30-minute break at like, you know,

24  what is it, like 11:45, 11:45, and I tell them to bring a

25  little something.  They shouldn't get starving and lose

 1   their concentration, and I recommend the same for the

 2   lawyers.

 3           Luckily you all live in the building, so you can

 4   go back to your offices to nosh.  I've had to let lawyers

 5   nosh a little something in the courtroom, which makes the

 6   cleaning guys very anxious.

 7           If I do have to find somebody else to try this

 8   case, it could be in New York City, but we'll cross that

 9   bridge when we come to it.

10           Anything else?

11           MR. COLLINS:  No, I think we're ready to take our

12   field trip with Ms. Attias.

13           THE COURT:  All right.  Thank you, everybody.  See

14   you at 3:15.

15           (Recess taken at 11:02 a.m. until 3:25 p.m.)

16           THE CLERK:  United States against Andrew Bartok.

17           THE COURT:  All right.  Good afternoon everyone,

18   again.  Mr. Alberts, Mr. Collins, Inspector Marsh,

19   Mr. Burke, Ms. Attias, Ms. Katz and Mr. Bartok.

20           Ms. Attias, why don't you fill me in on what you

21   found when you went to see those boxes.

22           MS. ATTIAS:  I found 32 boxes with 78,504

23   documents.

24           THE COURT:  Oh, dear.

25           MS. ATTIAS:  Happily we've been through one box.

1   We just picked a random box off the shelf and that box was a

2   copy of newspapers, full copies of newspapers that had been

3   in Mr. Bartok's office.  So perhaps we'll get pretty lucky.

4   Although I have seen and I will be waiting for a copy, there

5   is apparently a quite detailed index of what's in those

6   78,000 and a half documents, and it does not look pretty.

7   There are many, many, many, many documents that I'm going to

8   have to actually look at, and Ms. Katz will be starting

9   there, but the absolute truth of it, Judge, in all

10  seriousness is I cannot imagine competently and effectively

11  trying this case with that unfortunate discovery and what's

12  in the basement of the building, I cannot imagine trying

13  this in May.

14          So, of course, part of my conversation with

15  Mr. Bartok and Ms. Katz was downstairs with him while we

16  were just doing the last case, was that whether he would be

17  okay with the additional time it would take for me to fully

18  prep his case because, of course, he is incarcerated, and he

19  did hear this morning that the next possible date we were

20  looking at was probably November.

21          THE COURT:  I have an alternative.

22          MS. ATTIAS:  Okay.

23          THE COURT:  Actually, I took the opportunity of

24  the interregnum between part one and part two of this

25  conference to inquire whether the eight-week trial currently

 1   set for June 11 was really going to be eight weeks, and I

 2   was told that it is likely to be no more than six.  I guess

 3   the government is expecting some dispositions.  So I can do

 4   this trial July 23, if you guys can do it.

 5           I have another case set for August 6, but if that

 6   doesn't go away, I should be able to find somebody to do

 7   that one, because that's a short one.  So how is July 23?

 8           MS. ATTIAS:  Judge, I actually have two weeks of

 9   vacation scheduled immediately before then with my various

10   offsprings' schedules that was what we had sort of written

11   in stone a while ago.

12           THE COURT:  We could try July 23 and just get all

13   the pretrial stuff out of the way the first week in July.

14           MS. ATTIAS:  I don't think that I can take

15   vacation for the two weeks before trial.

16           THE COURT:  Well you can pretend the trial's

17   July 9 and get all ready and then go.  I mean, I hate to

18   have Mr. Bartok have to wait four months because of vacation

19   schedules.  I mean, look, I know it's not easy to go from

20   vacation mode right into trial mode, but if we got all the

21   pretrial stuff out of the way by July 6, then you could take

22   your two weeks and we can start -- excuse me, I don't mean

23   July 6, I mean June 29.  You're going to be away the weeks

24   of the 2nd and the 9th.  No, no, I'm backwards, I'm sorry.

25   Go back to what I was saying.  If we started the 23rd, we

1    could just get all the pretrial stuff out of the way by

2    July 6 and you would have the weeks of the 9th and the 16th

3    for your vacation.  I understand it's not ideal, but if you

4    are actually in the building July 23, I hate to put this off

5    till November.

6              MS. ATTIAS:  I hear what you're saying, Judge.  It

7    puts me into an almost impossible personal situation, and I

8    will just tell you that the two weeks before my vacation,

9    Ms. Brody is out of the office and I'm alone in the office

10   for two weeks staffing the entire courthouse.

11             THE COURT:  Well, somebody from the big city will

12   come and help.

13             MS. ATTIAS:  I'm sure.

14             THE COURT:  They'll have to, because you're going

15   to be busy prepping for trial.

16             Look, what I'm proposing is we're just going to

17   pretend like the weeks of the 9th and the 16th don't exist.

18   We're going to get completely ready to go by July 6 and then

19   we're just not going to start till the 23rd.

20             MS. ATTIAS:  I'm sorry, I just noticed that we put

21   a sentencing on for that week ten minutes ago.  I'm sorry,

22   I'm not thinking clearly.

23             THE COURT:  That's fine.

24             THE CLERK:  We'll finish up at 2:30.

25             THE COURT:  We'll finish the trial at 2:30 and

1    do --

2             MS. ATTIAS:  No, no, during the week that I'm out.

3    During one of my out weeks.

4             So it was either start July 23 or start July 23;

5    those are the two options?

6             THE COURT:  That's kind of where I'm at.  And I

7    don't want to ruin your vacation, but I feel like, if we get

8    everything, everybody is all set to go by July 6, then you

9    go, you take your vacation and we'll start picking a jury

10   the 23rd.

11            MS. ATTIAS:  Could we step up to sidebar for a

12   minute, please?

13            THE COURT:  Yes.

14            (Discussion at sidebar off the record)

15            THE COURT:  All right.  We are back on the record,

16   and although I hate to mess with Ms. Attias's plans, I

17   think, sad to say, it is the right thing to do given the

18   length of time that Mr. Bartok would otherwise have to wait.

19            So, we will have jury selection and trial July 23,

20   but we're going to have all the pretrial litigation

21   completed by July 6.

22            So let me ask Ms. Cama for a date for a final

23   pretrial conference the week of July 2, hopefully the jury

24   will have my previous case by then.

25            THE CLERK:  July 5, 10 a.m.

1          THE COURT:  Yes.  I think we could be reasonably

2    confident that the jury will -- wait, hold on.  I don't

3    think the jury will have the case by then, we better do

4    it --

5          THE CLERK:  Want to do it 3:30?

6          THE COURT:  Yes, 3:30 p.m.

7          THE CLERK:  3:30.  July 5.

8          THE COURT:  That will be our final pretrial

9    conference.  Now let's work backwards from the dates I had

10   previously set.  I had previously said the government was

11   going to turn over 3500 May 14, which is a week ahead.

12   Because of Ms. Attias's vacation, it will be three weeks

13   ahead.  That will be July 2.  Government exhibits is going

14   to be a week before that, which would be June 25.  June 14

15   for motions *in limine* and June 21 for opposition and

16   requests to charge and *voir dire* questions also June 21.

17          We'll exclude the time between now and July 23

18   under the Speedy Trial Act.  I find the ends of justice

19   served by the exclusion outweigh the best interests of the

20   public and the defendant in a speedy trial because it will

21   enable Ms. Attias to be prepared and will give her time,

22   with the help of Ms. Katz, to review not newly discovered

23   but newly appreciated 32 boxes.  The government has

24   represented that it will provide an index of the boxes and

25   be of whatever assistance it can be in streamlining that

1    process.

2            Anything else we ought to do now?

3            MR. ALBERTS:  One thing I just wanted to clarify

4    for the record, I know that Ms. Attias appreciates this, but

5    the index that we're providing to her is actually an index

6    of the cabinets that were searched at the original location.

7    We understand that they correspondence to the boxes, but

8    they don't, on the index itself, it doesn't identify what

9    box it goes to.  The first step in locating them is going to

10   be matching up the inventories with the boxes.  So it's not

11   technically an inventory of the boxes themselves as we

12   determined this morning.  But our understanding is it should

13   be a matter of opening the box and finding which index the

14   box corresponds to.

15           THE COURT:  Mr. Burke is waving.  It sounds like

16   maybe he and Ms. Attias or he and Ms. Katz --

17           MS. ATTIAS:  Can we go off for a second?

18           THE COURT:  Let me finish my sentence.  Will be

19   able to put two and two together.

20           (Counsel confer)

21           MR. ALBERTS:  Mr. Burke just wanted to make sure

22   that you understood that the items that we originally or the

23   postal agents originally seized they were copied by a

24   third-party vendor.  We're not sure how they did it.  So the

25   inventory we have is what Postal seized.  We assume they

1    copied it in some rational manner, but we have never gone

2    through the boxes to confirm that they correspond to the

3    index that they have.  That's an assumption.

4         THE COURT:  Maybe Ms. Attias is going to find the

5    smoking gun in there that you guys haven't found or whatever

6    the opposite of a smoking gun is.

7         MS. ATTIAS:  Or shoot myself with it.  Shoot

8    myself with a smoking gun.

9         THE COURT:  I think we all understand what the

10   inventory is, an inventory of what was seized at the sight

11   of the search warrant, it's not an inventory of what's in

12   the boxes, but we are hopeful the boxes bear some rational

13   relationship to where they were seized from and it wasn't

14   just a 52 pick-up at the third-party vendor.

15        And, Mr. Alberts, I know I'm messing with your

16   trial schedule, but maybe you can do the July 9 one and give

17   away the July 16 or something.  But this case being a longer

18   and more complicated one, I'm sorry that I had to

19   inconvenience both sides a little bit to get it tried in

20   some sort of reasonable timeframe, but with Mr. Bartok being

21   detained, this seems like it's the only real way to do it.

22        Anything more we should do now?

23        MS. ATTIAS:  Judge, just one piece of business.  I

24   did have a discussion with Mr. Collins where I had been

25   looking at the index of the Bates stamped materials that I

1   have been given and the index goes through, the Government's

2   index, and they've been, they have shared it with me and

3   prior counsel, goes through about 29,000, but the documents

4   go through about 36,000.

5                So, really?

6                MR. COLLINS:  29?  I apologize, your Honor, I

7   thought she only needed from September on.

8                MS. ATTIAS:  I'm missing 29,000 to 32,000

9   something.

10               MR. COLLINS:  I can fix that, but obviously we're

11  trying to, as the Court noted, we're trying to streamline

12  the process as much as possible.  So I misunderstood the

13  period of time that Ms. Attias needed the index --

14               MS. ATTIAS:  However --

15               MR. COLLINS:  -- for.  So I need to give her

16  probably a couple more pages.

17               THE COURT:  Couple more thousand pages.

18               MS. ATTIAS:  But we're playing very nicely so far.

19               THE COURT:  You seem to be working and playing

20  very nicely together, and I'm sure the Government's not

21  holing anything back.  So I don't foresee you needing my

22  help with any further discovery issues, but if you do, you

23  know where to find me.

24               MR. COLLINS:  And for the record, your Honor,

25  we're also turning over the document, the boxes inventory

1   which is Bates stamped Index 1 through Index 67 for the

2   record.

3              THE COURT:  That's the search warrant index and

4   not the box index.

5              MR. ALBERTS:  Correct, your Honor.

6              MS. ATTIAS:  Correct.

7              THE COURT:  Okay.  Anything else?

8              MS. ATTIAS:  That's plenty.

9              THE COURT:  Okay.  Thank you folks.

10              (Proceedings concluded at 3:46 p.m.)

11                    C E R T I F I C A T E

12   I, Angela A. O'Donnell, certify that the foregoing is a

13   correct transcript from the record of proceedings in the

14   above-entitled matter.

15              _____

16       Angela A. O'Donnell, RPR, Official Court Reporter

17    United States District Court, Southern District of New York

18

19

20

21

22

23

24

25