UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ORIGINAL

-------------------------------------------------------x

UNITED STATES OF AMERICA,　　　:

　　　　:

　　　-v.-　　　:

　　　　:

ANDREW BARTOK,　　　:

　　　　:

　　　　　Defendant.　　:

-------------------------------------------------------x

ANDREW BARTOK,　　　:

　　　　:

　　　　　Petitioner,　　:

　　　-v.-　　　:

　　　　:

UNITED STATES OF AMERICA,　　:

　　　　:

　　　　　Respondent.　　:

-------------------------------------------------------x

Dkt. No. 10 Cr. 510 (CS)

Dkt. No. 15 Civ. 5698 (CS)

# MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
## IN OPPOSITION TO ANDREW BARTOK'S MOTION TO SET
## ASIDE OR CORRECT HIS SENTENCE

PREET BHARARA
United States Attorney
Southern District of New York
Attorney for the United States of America

John P. Collins, Jr.
Assistant United States Attorney
– Of Counsel

i


RECEIVED
NOV 16 2015
U.S.D.C.
WP

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to Andrew Bartok's ("Bartok" or the "Petitioner") motion pursuant to Title 28, United States Code, Section 2255 to vacate, set aside or correct his sentence.  For the reasons set forth below, the Petitioner's motion lacks merit and should be denied without a hearing.

## BACKGROUND

### I.      Procedural History

Indictment S4 10 Cr. 510 (CS) (the "Indictment") was filed on February 15, 2012, in ten counts, charging Bartok with participating in a conspiracy to commit mail and wire fraud, in violation of Title 18, United States Code Section 1349 (Count One); mail fraud, in violation of Title 18, United Code, Sections 1341 and 2 (Count Two); participating in a conspiracy to commit offenses against the United States, to wit violations of Title 18, United States Code, Sections 152(3), 152(5), 152(9), 157, 1505 and 1519, in violation of Title 18, United States Code, Section 371 (Count Three); bankruptcy fraud, in violation of Title 18, United States Code, Sections 157 and 2 (Count Four); participating in a conspiracy to obstruct justice, in violation of Title 18, United States Code, Section 1512(k) (Count Five); making false statements to a United States Bankruptcy Judge, in violation of Title 18, United States Code, Section 1001 (Count Six); obstruction of justice, in violation of Title 18, United States Code, Sections 1519 and 2 (Count Seven); perjury, in violation of Title 18, United States Code, Section 1623 (Count Eight); obstruction of justice, in violation of Title 18, United States Code, Sections 1512(b)(1) (Count Nine); and contempt of court, in violation of Title 18, United States Code, Section 401(3) (Count Ten).

On April 5, 2012, the Court severed Counts Eight and Ten.[1]  Trial commenced on October 3, 2012, and ended on October 24, 2012, when the jury found Bartok guilty of Counts One through

---

[1] At sentencing, the Government moved to dismiss the two severed counts without prejudice and the Court granted the Government's motion.

Seven and not guilty of the obstruction of justice charge that was Count Nine of the Indictment (presented to the jury as Count Eight of a redacted indictment).

On or about October 9, 2013, this Court sentenced Bartok principally to a term of 22 years' imprisonment and 3 years' supervised release.

On or about November 7, 2013, Bartok filed a timely notice of appeal. Bartok's appeal is currently pending and counsel has informed the Court of Appeals that the due date for his brief is February 12, 2016.

On or about July 6, 2015, Bartok filed the instant petition alleging that: (1) he received ineffective assistance of counsel when his counsel failed to challenge the Government's lack of standing to prosecute him; (2) he received ineffective assistance of counsel when his counsel failed to argue a speedy trial violation; (3) he received ineffective assistance of counsel at his sentencing; (4) he received ineffective assistance of counsel when counsel failed to seek the removal of the Honorable Cathy Seibel. On or about September 27, 2015, Bartok amended his petition to further allege that his trial was unfair due to admission of a CJA 23 Affidavit pursuant to Fed. R. Crim. P. 404(b).

## II.    Trial

### A.    The Government's Case

The Government's evidence at trial demonstrated conclusively that Andrew Bartok and his co-conspirators perpetrated a decade-long scheme to defraud hundreds of homeowners who were on the verge of losing their homes in foreclosure. Bartok obtained millions of dollars from these homeowners by lying to them. Bartok's lies included falsely telling homeowners that he was a foreclosure expert and that he knew of methods that would enable them to buy their homes back at a foreclosure auction for a fraction of what they owed on their mortgage. Bartok also lied to the

2

homeowners by telling them that his program did not involve bankruptcy. In fact, Bartok never saved the homes of any of his customers using his methods. Bartok put the homeowners through bankruptcy, sometimes without even telling the homeowners that he was doing so.

Bartok and his co-conspirators would file bankruptcy petitions in the names of these homeowners by forging the homeowners' signatures and then fill the petitions with false information. They would not tell the homeowners that these petitions, which were filed under penalty of perjury, were filled with lies. In furtherance of this scheme, Bartok also lied to a United States Bankruptcy Judge, counseled a co-conspirator not to produce documents in response to a court order, and told his clients not to participate in mandatory bankruptcy proceedings.

At trial, the Government called approximately 12 witnesses and introduced over 600 exhibits into evidence. The Government's witnesses included several actual or prospective victims of the fraud, two of Bartok's co-conspirators who testified pursuant to cooperation agreements with the Government, a Standing Chapter 13 Bankruptcy Trustee for the Southern District of New York, a trial attorney from the Office of the United States Trustee in the Southern District of New York, a municipal assessor from Bartok's home town, and a summary witness who testified concerning financial records that were in evidence. This witness testimony was amply corroborated by numerous exhibits, including bankruptcy records, bank statements, summary charts, records seized from Bartok's office, letters written by Bartok, and stipulations.

### 1.    Background

In 1999, Bartok operated a company operating under the name "U-File-It" (Tr. 192-93).   Later that year, Bartok changed the name of this company to Revelation, LLC.  (Tr. 194). Between 1999 and 2010 the principal office of Revelations, LLC was located in New Jersey.  (Tr. 195). Revelations, LLC operated principally in New York and New Jersey (Tr. 324, 1006), but also

3

had customers in Connecticut, Georgia, Florida, and Pennsylvania, (Tr. 1028). In 2010, Bartok again changed the name of the company – to "Foreclosure Club of America" – after Postal Inspectors with the United States Postal Inspection Service searched Revelations' office in Clifton, New Jersey. (Tr. 1037-38).

From at least 1999 through February 2011, Bartok owned and managed the company operating under the names U-File-It, Revelations, LLC, and Foreclosure Club of America (collectively referred to herein as "Revelations"). During this time period, Bartok hired a number of employees, including the cooperating witnesses Kathleen Addario and Veronica Tobin, both of whom ultimately held managerial positions. (Tr. 419, 479).

### 2.     Bartok and His Co-Conspirators Lied to Solicit Clients

Bartok and his employees solicited clients by mailing flyers to homeowners who were facing foreclosure. The flyers stated that Revelations could "stop foreclosure without bankruptcy" and provided a phone number to call. (GX 2338, 6011; see also Tr. 198-99). When a homeowner called the number listed on the flyer, he or she spoke with Kathleen Addario, or another Revelations employee, who would attempt to schedule an appointment between the homeowner and Bartok. (Tr. 202-03). The homeowners who did schedule an appointment would then meet with Bartok--or in later years Bartok, Addario or Tobin--in Revelations' office. (Tr. 204, 995-96, 1006-07). During the meetings that Bartok attended, he told the homeowners, among other things, that (a) he knew of a method the clients could use to buy back their homes at a foreclosure auction, (Tr. 208), (b) he knew the method worked because he had used it himself, (Tr. 1185-86), (c) he, or another Revelations employee, would accompany the homeowner to the foreclosure sale to help them repurchase their home, (Tr. 209), and (d) to get the benefit of Revelations' services, the homeowner would have to pay an up-front fee of one to two thousand dollars plus a substantial

4

monthly fee, (Tr. 555). Bartok generally would avoid saying anything about bankruptcy at these meetings, leaving customers with the impression from the flyer that they would not be put through bankruptcy. (Tr. 553, 996-97).

Bartok's statements to the homeowners in the flyers and in the meetings in Revelations offices were lies. None of his hundreds of clients ever repurchased a home at a foreclosure auction using his methods. (Tr. 210, 516, 1011). Bartok never went to a foreclosure auction with any of his clients. (Tr. 1011). Bartok himself lost his home and never bought it back. (Tr. 1441-42; GX 3544-47). Finally, Bartok and his co-conspirators put nearly every client through bankruptcy, unless they quit paying before the bankruptcy was filed. (Tr. 218, 1033).

### 3. Bartok and His Co-Conspirators Deceived Clients About Bankruptcy Filings

Revelations' core business was not repurchasing homes; it was putting clients through bankruptcy. Bartok was dishonest with his clients about this bankruptcy business, just as he was about his purported methods for enabling clients to repurchase their homes. In some instances, Bartok would have his employees file bankruptcy petitions in the names of his clients without even telling the clients that he was doing so. (Tr. 559-60, 623-24, 633-34, 723-24, 728).

More frequently, Bartok would include false statements in these bankruptcy petitions, including gross exaggerations of his clients' income and omissions of their expenses and liabilities. (Tr. 235-36, 572-74, 635, 1019-22, 1380-84). Bartok would not tell his clients that he had put these lies in the bankruptcy petitions or that these lies could expose his clients to criminal liability and arrest. (Tr. 232, 517-18, 555, 636, 641). The reason that he would not tell his clients about these lies in these documents was that he knew that if his clients knew about the lies, then many of them would not sign these false documents and would not agree to pay him for committing

crimes in their names. (Tr. 1022, 1334-35). Instead of telling his clients about the lies, Bartok, or one of his employees, generally would forge their signatures on the documents containing these false statements and then file them under penalty of perjury. (Tr. 231-32, 239, 264-65, 564-66, 567-68, 636-37, 727-28, 730-31, 1022).

### 4.   Bartok and His Co-Conspirators Violated Bankruptcy Laws and Tampered With Witnesses in Bankruptcy Proceedings

Bartok's abuse of the bankruptcy system did not end with the filing of fraudulent bankruptcy petitions. The filing of the petitions created an automatic stay on the foreclosure actions that were proceeding against his clients' homes. Accordingly, after the petitions were filed, Bartok would employ a variety of unlawful techniques to delay the inevitable dismissal of those bankruptcy petitions and would thereby prolong the period of time during which his clients would continue to make monthly payments to him before losing their homes. In addition, Bartok would regularly violate bankruptcy law to conceal the participation of Revelations – and thus himself -- in this criminal scheme.

First, despite the fact that Revelations prepared the bankruptcy petitions, Bartok directed his employees to not list Revelations or Bartok himself as the bankruptcy petition preparer, as required by Section 110 of the Bankruptcy Code. (Tr. 67, 228, 572, 641, 728-29). This practice continued even after a bankruptcy court sanctioned Bartok in September 2008 for failing to comply with Section 110. (GX 3106, Tr. 306-11).

Bartok also instructed his clients not to attend court proceedings, including mandatory meetings of the creditors, and not to produce documents that they were required to produce at those proceedings. (Tr. 246-47, 254, 562-63, 1028-29). Bartok would also seek to delay his clients' scheduled creditor's meetings by instructing his employees to send letters to the

6

Standing Chapter 13 bankruptcy trustee that falsely stated that the clients were unable to attend the creditor's meeting due to various fabricated scheduling conflicts. (Tr. 247-48, 857-58, 1029). At Bartok's direction, his employees would forge the clients' names on these letters, typically without the client's knowledge. (Tr. 256-57, 656, 657, 864).

Bartok and his co-conspirators also filed motions in the bankruptcy courts that bore forged client signatures. (Tr. 255-57, 1031-33). When bankruptcy courts denied one of those motions, as they regularly did, Bartok and his co-conspirators would often then file one or more additional bankruptcy petitions in the client's name--knowing that these would also be dismissed-- with the purpose of delaying the bankruptcy process and thus delaying foreclosure on the client's home while all the while continuing to receive fees from the client. (Tr. 257-58). In some instances, after the subsequent petitions were filed in the name of the client and dismissed by the bankruptcy court, Bartok and his co-conspirators would instruct the client to transfer an interest in the home to a third party, such as a relative, and would then file yet another bankruptcy petition in the name of the transferee, again for the sole purpose of delaying foreclosure on the client's home. (Tr. 743-50, 1033). The deeds transferring the property interest would often be falsely backdated in order to conceal that the true purpose of the transfer was to delay the foreclosure. (Tr. 313, 337-38, 528, 1033-36).

### 5. Bartok Lied to a Bankruptcy Judge and Told a Co-Conspirator Not to Produce Documents in Response to the Judge's Order.

Bartok's efforts to conceal his participation in the preparation of fraudulent bankruptcy filings failed when two of his clients were arrested in 2008 based on arrest warrants issued by United States Bankruptcy Judge Cecilia Morris in those clients' bankruptcy actions. These arrests led to an investigation by the United States Trustee seeking information about

Revelations' practices. In an effort to obstruct this investigation, Bartok lied in documents filed with the bankruptcy court and advised his co-conspirator Kathleen Addario not to comply with an order issued by Judge Morris.

One of the clients whose arrest led to the investigation into Revelations testified at Bartok's trial. This client, Pasquale Degiorgio, explained that prior to his arrest he had not known that Bartok filed a bankruptcy petition on his behalf and was not aware of the filings entered in his case leading up to his arrest. (Tr. 730-33). These filings included bankruptcy petitions filed in Degiorgio's name, (GX 431, 6002, 6003), on which Degiorgio's signature was forged; a motion by the bank holding the mortgage on Degiorgio's home to terminate with prejudice the automatic stay on the bank's foreclosure action against Degiorgio's home, (GX 434); and an opposition to that motion, on which Andrew Bartok forged Degiorgio's signature, (Tr. 264-65; GX 435). The opposition was filed in the name of Pasquale Degiorgio on January 17, 2006 and was entitled "Objection and Certification to Creitor's Dismissal Motion" [sic] (the "Degiorgio Objection"). The Degiorgio Objection falsely stated that Degiorgio filed the bankruptcy petition, filed the Chapter 13 plan, and adjourned his creditor's meeting. (GX 435 ¶1; Tr. 733-35). The Degiorgio Objection also falsely stated that "the alleged creditor's lawyer and trustee upon information and belief is biased and prejudiced and has shown a pattern of pro se profiling and racial profiling." (GX 435 ¶ 20; Tr. 736).

On January 19, 2006, Judge Morris entered an order directing Degiorgio to appear at a hearing on February 7, 2006, and to show cause why he should not be sanctioned for making "baseless and inapplicable" factual and legal claims "solely for the purpose of delay, harassment, or to increase the costs of litigation." (GX 437 at 3). On February 9, 2006, after Degiorgio did not appear at the hearing, Judge Morris entered an order holding Degiorgio in contempt, directing him

to appear at a contempt hearing on March 7, 2006, and stating that if he did not appear at that hearing, "the Court will obtain the assistance of the United States Marshals Service to take the Debtor into custody and compel the Debtor's attendance." (GX 438 at 1; see generally Tr. 793-800).

On May 2, 2006, after Degiorgio did not appear at the contempt hearing, Degiorgio and Evelyn Colon, another client of Revelations, were arrested and compelled to appear before Judge Morris. (Tr. 387, 792). At that hearing, Degiorgio told Judge Morris that he had not known that a bankruptcy petition was filed in his name and had not read or signed the Degiorgio Objection. (Tr. 726, 800-01). Based in part on these statements, the United States Trustee applied for and obtained orders directing Pasquale Degiorgio and Evelyn Colon to appear for examinations at the Office of the United States Trustee. Degiorgio and Colon appeared at the scheduled examinations and produced documents at their examinations, including a flyer from Revelations signed in the name "Kathleen Kelly." (Tr. 801-06; GX 439-41, 6011).

On June 8, 2006, the United States Trustee submitted an application to Judge Morris for an order authorizing the examination of "Kathleen Kelly" and directing the production of documents. (GX 444, 445). The United States Trustee filed the application in order to determine "if any provisions of Title 11, the Federal Rules of Bankruptcy Procedure, the New York State Judiciary Law or any other statutes have been violated in connection with the preparation of the documents related to this and other bankruptcy cases involving the person sought to be examined herein." (GX 444 ¶ 3). On or about June 16, 2006, Bartok filed a document opposing the United States Trustee's application. (GX 446). In this filing Bartok stated that "this is my written objection to the proposed order" and that "I Andrew Bartok am the Owner and Managing Associate of Revelations LLC and all further notices regarding this matter are to be addressed to my

9

attention." (GX 446 at 1). On June 19, 2006, the Bankruptcy Court issued an order directing "Kathleen Kelly" to appear on July 21, 2006 at the Office of the United States Trustee to be examined and produce documents (the "Appearance Order"). (GX 447).

On July 6, 2006 Andrew Bartok filed a motion in the bankruptcy court captioned "MOTION FOR RECONSIDERATION & TO REMOVE JUDGE CECELIA MORRIS" and also captioned as a "CERTIFICATION IN SUPPORT OF RECONSIDERATION and REMOVAL OF JUDGE CECELIA MORRIS." (GX 449A). Bartok alleged in this filing [at ¶ 5] that "Judge Morris is 'biased and has a personal vendetta' against me, Kathleen Kelly, and my company, Revelations Consulting, LLC., located at 4514 Bergen Turnpike, North Bergen, NJ 07047." In this filing, Bartok concealed and covered up that "Kathleen Kelly" was actually an alias for his co-conspirator Kathleen Addario. Bartok also falsely stated that "Kathleen Kelly" did not have personal knowledge concerning the bankruptcy case referenced in the Appearance Order. (Tr. 275-76; GX 449A ¶ 2).

Bartok and Addario discussed the Appearance Order and the subpoena served by the United States Trustee pursuant to the Appearance Order. (Tr. 279). Bartok advised Addario that she did not have to appear in response to the Appearance Order (Id.). Bartok also instructed Addario, "Don't worry about anything. I'm going to handle it." (Id. at 279, 283). Neither Bartok nor Addario produced documents at the July 21, 2006 examination at the Office of the United States Trustee, as required by the Appearance Order. (Tr. 275-79, 826-27).

## III.    Verdict and Sentencing

The trial ended on October 24, 2012, when the jury found Bartok guilty of Counts One through Seven and not guilty of the obstruction of justice charge that was Count Nine of the Indictment (presented to the jury as Count Eight of a redacted indictment).

10

On or about October 9, 2013, this Court sentenced Bartok principally to a term of 22 years' imprisonment and 3 years' supervised release. His appeal is currently pending.

## DISCUSSION

### I.    Bartok's Claims of Ineffective Assistance of Counsel Are Meritless

Bartok claims that his attorneys were ineffective at various stages of the case – both prior to and after his trial.  Bartok's arguments are without merit and must be denied because (i) he cannot show that counsel's performance was deficient; and (ii) he cannot show that he was prejudiced by any of the alleged deficiencies.

### A.    Applicable Law

To prevail on a claim of ineffective assistance of counsel, a defendant must (1) overcome a "strong presumption" that his attorney's conduct was reasonable and show that the representation "fell below an objective standard of reasonableness" under "prevailing professional norms"; and (2) "affirmatively prove prejudice," that is, show "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland v. Washington, 466 U.S. 668, 687-89, 693-94 (1984); accord, e.g., Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).

To satisfy the first prong of Strickland, a defendant must show that his "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment."  Strickland v. Washington, 466 U.S. at 687.  The benchmark for judging a claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.  United States v. DiTommaso, 817 F.2d 201, 215 (2d Cir. 1987) (citing Strickland, 466 U.S. at 686).  In assessing the alleged deficiency of counsel, the reviewing court must "indulge a strong presumption that

11

counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466

U.S. at 689; see also, e.g., United States v. Leslie, 103 F.3d 1093, 1099 (2d Cir. 1997).  Also,

"every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the

circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's

perspective at the time." Id.

The Strickland standard expressly recognizes that "[t]here are countless ways to

provide effective assistance in any given case," and that "[e]ven the best criminal defense attorneys

would not defend a particular client the same way." Id.  Thus, "strategic choices made after

thorough investigation of law and facts relevant to plausible options are virtually unchallengeable;

and strategic choices made after less than complete investigation are reasonable precisely to the

extent that reasonable professional judgments support the limitations on investigation." Id. at 690-

91.

Finally, even if an attorney's performance was objectively unreasonable, the

defendant must also prove prejudice.  The defendant "must show 'that counsel's errors were so

serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" Lockhart v.

Fretwell, 506 U.S. 364, 369 (1993) (quoting Strickland, 466 U.S. at 687).  The reviewing court must

assess "whether, absent counsel's deficient performance, there is a reasonable probability that the

outcome of the proceeding would have been different." Mayo, 13 F.3d at 534.  "'A reasonable

probability is a probability sufficient to undermine confidence in the outcome.'" Id. (quoting

Strickland, 466 U.S. at 694).  Moreover, "an analysis focusing solely on mere outcome

determination, without attention to whether the result of the proceeding was fundamentally unfair or

reliable, is defective." Lockhart v. Fretwell, 506 U.S. at 369.  "The 'prejudice' component of the

Strickland test . . . focuses on the question whether counsel's deficient performance renders the

result of the trial unreliable or the proceeding fundamentally unfair." Id. at 372; see Bunkley v. Meachum, 68 F.3d 1518, 1522-23 (2d Cir. 1995); see also Fretwell, 506 U.S. at 369 ("To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him.").

As the Strickland Court noted, the "object of an ineffectiveness claim is not to grade counsel's performance," and that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." 466 U.S. at 697. Accordingly, the ineffectiveness decisions issued by the courts commonly consider, among other things, the strength of the Government's case. See Strouse v. Leonardo, 928 F.2d 548, 556 (2d Cir. 1991) (court declines to address alleged deficiencies of counsel given the overwhelming evidence of guilt at trial); United States v. Simmons, 923 F.2d at 956 ("[G]iven the plethora of evidence against [appellant], there is little reason to believe that alternative counsel would have fared any better."); United States v. Reiter, 897 F.2d 639, 645 (2d Cir. 1990) (although counsel's performance fell below professional standards, Sixth Amendment claim fails "given the overwhelming evidence of [the defendant's] guilt"); United States v. Nersesian, 824 F.2d 1294, 1322 (2d Cir. 1987) (no prejudice where evidence is overwhelming).

## B.      Discussion

Bartok alleges that: (1) he received ineffective assistance of counsel when his counsel failed to challenge the Government's lack of standing to prosecute him; (2) he received ineffective assistance of counsel when his counsel failed to argue a speedy trial violation; (3) he received ineffective assistance of counsel at his sentencing; and (4) he received ineffective assistance of counsel when counsel failed to seek the removal of the Honorable Cathy Seibel.

13

1.      **Lack of Standing Claim.**

Bartok claims, in a conclusory fashion, that counsel has been ineffective both in the

pre-trial phase and on "direct appeal" in failing to challenge the Government's lack of standing.

(Petition at 4).  Obviously, since appellate counsel has not even filed a brief, it is wholly premature

to contend that appellate counsel is ineffective.  In any event, Bartok's allegations that the

Government lacked standing to prosecute him because the Indictment is defective are meritless.

First, on June 9, 2010, the Grand Jury returned an Indictment against Bartok and his

then co-defendant Kathleen Addario. (Exhibit A).  Contrary to Bartok's argument that there was an

"irregularity" or lack of due process because an "AO 190" form was not filed, it is clear – from the

transcript of the proceedings on June 9, 2010, (6/9/10 Tr. at 2 (attached as Exhibit B)) -- that the

Indictment was properly returned by the Grand Jury in open court and filed with the District Court.

Indeed, "[grand juries] return into court only those accusations which they have approved, and the

fact that they thus return them into court is evidence of such approval." Frisbie v. United States, 157

U.S. 160, 163 (1895).

To the extent that Bartok is complaining that he has not seen a copy of the separate

record showing the number of grand jurors who concurred in the Indictment, such records are filed

with the Clerk of the Court and "may not be made public unless the court so orders." Fed. R. Crim.

P. 6(c); Samas v. United States, No. 3:12-cv-00151 (VLB), 2014 WL 1653219, at *9 (D. Conn.

April 23, 2014) (rejecting claim that counsel was ineffective for failing to file a motion to dismiss

for lack of jurisdiction on the basis that the Grand Jury proceedings did not comply with Fed. R.

Crim. P. 6(c) and 6(f)); cf. Kalani v. United States, No. 02 Civ. 8663, 2002 WL 31453094

(S.D.N.Y. Oct. 31, 2002) (rejecting petitioner's claim in 2255 petition that his indictment was not

returned in open court in the presence of the grand jury where petitioner failed to provide any

14

"specific factual allegations tending to show that the Indictment was returned in violation of the Local Rules in this District and Rule 6(f)" and rejecting related claim of ineffective assistance of counsel for the same reason); United States v. Canty, No. 1–97–CR–97, 1998 WL 903621 (N.D.N.Y. Dec.21, 1998) (denying defendant's motion for disclosure and inspection of the grand jury concurrence form where defendant "has not presented any specific factual allegations tending to show that the indictment lacked the concurrence of twelve grand jurors" nor demonstrated a "compelling or particularized need to examine the grand jury concurrence form" and where the request was "aimed generally at confirming the Government's compliance with the twelve juror minimum requirement" of Rule 6(f)) (quotation and citations omitted).

Second, Bartok's claim that the Indictment is not valid because it was not signed by the United States Attorney is meritless. As the Government made clear in earlier proceedings, all of the Indictments were signed by supervisory personnel who were authorized by the United States Attorney to sign his name on charging documents – including Indictments and Informations. To the extent that Bartok argues that the Indictment charging him, or any of his co-defendants, must be signed by the United States Attorney, such a claim is belied by Fed. R. Crim. P. 7(c)(1) which states only that the Indictment or Information "must be signed by an attorney for the government." (emphasis added). Pursuant to Title 28, United States Code, Section 547, the United States Attorney has the authority to designate and delegate who in his Office shall be authorized to exercise signature authority under Fed. R. Crim. P. 7(c)(1). Given that Bartok does not allege that the Indictments and Informations were not signed by an attorney for the Government, his claim must be dismissed.

Given that both of these allegations are frivolous, his counsel were not ineffective in failing to raise these issues before the District Court. Indeed, other than a conclusory statement that

15

his attorneys were ineffective, Bartok has not made any specific allegations implicating his attorneys and simply seeks to raise an issue that was not previously preserved. Further, Bartok served as his own attorney, for a period of time, after the return of the initial Indictment and could have raised these issues at that time. On those grounds as well, his claims can and should be dismissed as procedurally defaulted. See United States v. Santoprieto, 166 F.3d 88, 94 (2d Cir. 1999) (challenge to jury instruction waived by failure to raise at trial absent showing of cause and prejudice), abrogated on other grounds by Sabri v. United States, 541 U.S. 600, 604 (2004).

### 2. Speedy Trial

Next, Bartok contends his counsel were ineffective in failing to argue that his speedy trial rights were violated and that his Indictment was not timely filed. Once again, aside from his initial conclusory statement that his counsel was ineffective, Bartok makes no specific allegations as to how his attorneys were ineffective and his claim, which is being raised now for the first time, should be deemed procedurally defaulted. In any event, his claim is meritless because his attorneys agreed to the exclusion of time.

The Speedy Trial Act requires that "any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which the individual was arrested or served with a summons in connection with such charges." 18 U.S.C. § 3161(b). The Act provides that this time may be extended "if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(8)(A). In granting an extension under § 3161(h)(8)(A), the court must state its reasons, either orally or in writing, for finding that the continuance is warranted. Id. If an indictment is not

16

filed within the time limit required by § 3161, the charges against that individual "shall be dismissed or otherwise dropped." 18 U.S.C. § 3162(a)(1).

On March 16, 2010, Bartok was arrested. That same day, Bartok was presented and advised of his right to a preliminary hearing. (3/16/10 Tr. at 16 (attached as Exhibit C)). Bartok and his attorney, Amy Attias, Esq., discussed the matter and "with . . . Bartok's consent . . . [adjourned the hearing] for 30 days. United States Magistrate Judge Paul E. Davison then scheduled the preliminary hearing for April 14, 2010 (a period of 29 days). (Exh. C at 16).

Prior to April 14, 2010, Assistant U.S. Attorney Nicholas L. McQuaid spoke with Bartok's then attorney, David Wikstrom, Esq., about a possible disposition of the case prior to trial. (Exhibit D at 4). On or about March 31, 2010, Mr. Wikstrom agreed, on behalf of Mr. Bartok, to a further continuance of 28 days and to adjourn the preliminary hearing date until May 12, 2010. (Exh. D at 4). On April 14, 2010, Judge Davison, based upon those representations, agreed that a continuance of 28 days "serves the ends of justice and outweighs the best interest of the public in a speedy trial" and ordered a continuance of the preliminary hearing until May 12, 2010. (Exh. D 1-2).

Prior to May 12, 2010, Assistant U.S. Attorney Nicholas L. McQuaid spoke again with Bartok's then attorney, David Wikstrom, Esq., about a possible disposition of the case prior to trial. (Exhibit E at 2). On or about May 3, 2010, Mr. Wikstrom agreed, on behalf of Mr. Bartok, to a further continuance of 28 days and to adjourn the preliminary hearing date until June 9, 2010. (Exh. E at 2). On May 12, 2010, Judge Davison, based upon those representations, agreed that a continuance of 28 days was proper and ordered a second continuance of the preliminary hearing until June 9, 2010. (5/12/10 Tr. at 2 (attached as Exhibit F)).

On June 9, 2010, a grand jury indicted Bartok and his co-defendant Kathleen Addario.

Here, there was no reason for Mr. Wikstrom to object to the exclusion of time because Mr. McQuaid's affirmations were truthful -- the defense agreed to adjourn the preliminary hearing date because the parties were discussing a possible disposition of the case prior to trial.  The facts here do not in any way resemble those of <u>United States</u> v. <u>Rivera</u>, 25 F. Supp. 2d 167, 169 (S.D.N.Y. 1998).  Separate and apart from the fact that the affirmations filed here explicitly reference the specific dates of conversations with defense counsel and the substance of the conversations, well before 2010, the District Court was advising counsel by electronic mail of docket entries so, unlike in <u>Rivera</u>, there is no possibility that counsel was not aware of the exclusion of time.

As a result, this Court should deny Bartok's claim that there was a speedy trial violation or that his counsel(s) were ineffective in failing to raise such a claim.

### 3.      Sentencing

Despite being sentenced to a term of imprisonment that is 73 years less than the applicable Guidelines range, Bartok alleges that Amy Attias, Esq., was ineffective during the sentencing proceedings.  Again, the record belies Bartok's contentions.

First, Bartok contends that Ms. Attias failed to make "any sentencing recommendation or submission that entered onto the docket." (Pet. at 25).  The record is clear that Ms. Attias made a sentencing submission to the Court and argued for a sentence of between six to eight years' imprisonment. (9/18/13 Letter at 2-3 (attached as Exhibit G)).  The Court also received Ms. Attias' sentencing submission, (see 10/9/13 Tr. at 18 (attached as Exhibit H)), as did Mr. Bartok. (See 10/9/12 Tr. at 20).

18

Second, to the extent that Bartok has objections to the Pre-Sentence Report ("PSR"), it is clear that Bartok failed to share those objections with his attorney. The record makes clear that: (1) Ms. Attias reviewed the PSR with Bartok; (2) mailed him the final copy of the PSR; (3) mailed him a copy of her submission; (4) mailed him both of the Government's submissions; and (5) received multiple letters from Bartok including sometimes multiple letters a day. (See 10/9/13 Tr. at 20). Yet, Bartok's only specific objection, in his petition, is to Attias's arguments concerning the "bad check" conviction, (see Petition at 25). Bartok fails to recount in his petition that in spite of the PSR's specific research concerning that conviction, the Government mooted the issue by agreeing that the conviction should count for two rather than three criminal history points. As a result, the only issue that he raises concerning his sentencing had no effect on his Guidelines range, and thus did not prejudice him. (See 10/10/13 Tr. 30-32 (attached as Exhibit I)).

Indeed, Bartok's belief that Ms. Attias was unprepared for the sentencing is completed refuted by not only Ms. Attias's affidavit, (attached as Exhibit J)), but also her exceptional argument in an attempt to persuade the Court not to "stack" the counts of conviction and thus expose Bartok to a potential sentence of 95 years' imprisonment, but instead to sentence Bartok to approximately six to eight years' of imprisonment. (See 10/10/13 Tr. at 36-40).

Third, Bartok argues that the Government did "not meet its burden of proof with respect to any prior conviction." (Petition at 26). To the extent that Bartok believes that his cited case stands for the proposition that the Government must proffer a certified copy of conviction, he is incorrect. Indeed that case, United States v. Campos-Rodriguez, No. 11-2045-cr, 475 Fed. Appx. 367 (2d Cir. 2012), stands for the exact opposite proposition: "The government is not obligated [to provide a certified copy of the convictions]." Id. at 369. Further, the only conviction that received any criminal history points – his July 1994 conviction for Theft by Deception and Issuing a Bad

19

Check, (see PSR ¶¶ 76-77) – was a conviction that he admitted to at sentencing by providing information used to revise the number of criminal history points assigned to the conviction. (10/10/13 Tr. at 30-32). Bartok fails to understand that none of the other convictions were assigned criminal history points and even the July 1994 conviction did not affect his Guidelines range because the Guidelines range for an offense level of 43 is life[2] – no matter whether the defendant is in Criminal History Category I or VI.

Finally, while at sentencing Bartok argued that he was concerned about the impact of dismissed arrests on his Bureau of Prisons designation, (see 10/10/13 Tr. at 41-42), he now argues that they improperly influenced his sentence. As noted supra, the Court's sentence was decades below the applicable Guidelines range and the Probation Department's recommended sentence – both 95 years' imprisonment. In any event, the Court expressly stated that though the "arrests happened . . . I'm certainly not taking them into account . . . . It's not being held against you." (10/10/13 Tr. 42). Thus, separate and apart from the fact that the Court could have taken the dismissed arrests into account in determining an appropriate sentence, see United States v. Broxmeyer, 699 F.3d 365, (2d Cir. 2012) ("[I]t is highly relevant—if not essential—to [the] selection of an appropriate sentence that [the District Court] possess the fullest information possible concerning the defendant's life and characteristics . . . [and] there is no question that such an inquiry appropriately considers a defendant's past criminal behavior, even if no conviction resulted from that behavior.") (internal quotation marks and citations omitted)), the record is clear that contrary to Bartok's claim, the Court did not rely on his dismissed arrests.

   4.    **Recusal**

---

[2] Here, the Guidelines range was 95 years – the sum of all the statutory maximums – because none of the counts of =convictions had a statutory maximum of life imprisonment. See U.S.S.G. Section 5G1.2(d).

Finally, Bartok alleges that he received ineffective assistance of counsel because his counsel failed to move prior to trial to recuse The Honorable Cathy Seibel. (Pet. Add at 1). While the title of this section claims that counsel was ineffective, the entirety of petitioner's argument is spent relitigating the recusal motion that was filed post-trial but prior to his sentencing. Bartok's claim should be denied not only because he fails to identify any manner in which his counsel was ineffective but also because his argument -- as the Court already determined -- is substantively meritless and was waived. (10/9/13 Tr. 3-9; 5/29/13 Tr. 23-24 (attached as Exhibit K); see 9/27/13 Govt. Mem. (attached as Exhibit L)).

## II.   Bartok's Claim that His Trial Was Unfair Due to the Admission of His Financial Affidavit is Meritless

On or about September 27, 2015, Bartok supplemented his petition by further alleging that the District Court improperly admitted his financial affidavit into evidence at his trial. Bartok claims that "the Court's admission of a financial affidavit aimed at impugning [Bartok's] character . . . took the juror's focus off the government's burden." (Pet. Supplement at 7). His argument is meritless.

Contrary to Bartok's argument, the Government sought to admit the CJA 23 Affidavit on the ground that his "misstatements [in the CJA 23 Affidavit] to this Court [were] relevant to his knowledge, intent, and absence of mistake [pursuant to Rule 404(b)(2)]." (9/12/12 Govt. Mem. at 22 (attached as Exhibit M)).

During trial, this Court admitted the CJA 23 Affidavit on the ground that it was relevant to Bartok's intent and was not unduly prejudicial (Trial Tr. 1450). This Court heard extensive argument on several occasions concerning the admissibility of the document, (see 10/1/12 Tr. 64-69 (attached as Exhibit N); Trial Tr. 1445-52, 1456-82; 1565-66; 1650-60), and admitted the

document pursuant to Rule 404(b) with a limiting instruction. (Trial Tr. 1730-31). Aside from

Bartok's disagreement with this Court's conclusion, he has not identified any other basis as to why

the Court's admission of a redacted version of the document was not appropriate. (See Trial Tr.

1729; GX 7200-R; GX 7201-R (attached as Exhibit O and P)). As a result, his claim should be

denied because the CJA 23 Affidavit was properly admitted pursuant to Fed. R. Crim. P. 404(b)(2).

See United States v. Aminy, 15 F.3d 258, 259-60 (2d Cir. 1994); United States v. Zackson, 12 F.3d

1178, 1182 (2d Cir. 1993) ("Where a defendant claims that his conduct has an innocent explanation,

prior act evidence is generally admissible to prove that the defendant acted with the state of mind

necessary to commit the offense charged"); United States v. Cassiere, 4 F.3d 1006, 1021-1022 (1st

Cir. 1993) (evidence of uncharged transactions in wire fraud prosecution admissible to show

defendants' knowledge of preparing and submitting fraudulent documents).

## III.   A Hearing Not Required

Although Section 2255 requires the district court to hold a hearing "[u]nless the

motion and the files and records of the case conclusively show that the prisoner is entitled to no

relief," it also provides that a "court may entertain and determine such motion without requiring the

production of the prisoner at the hearing." As the Supreme Court has explained, the language of

Section 2255 does not

> imply that a movant must always be allowed to appear in a district
> court for a full hearing if the record does not conclusively and
> expressly belie his claim, no matter how vague, conclusory, or
> palpably incredible his allegations may be. The language of the statute
> does not strip the district courts of all discretion to exercise their
> common sense. Indeed, the statute itself recognizes that there are
> times when allegations of facts outside the record can be fully
> investigated without requiring the personal presence of the prisoner.

22

Machibroda v. United States, 368 U.S. 487, 495 (1962).

       Depending on the circumstances, a district court may decide a habeas petition on the existing record, may choose to expand the record through documentary evidence and affidavits, or may choose to hold a full blown hearing.  United States v. Chang, 250 F.3d 79 (2d Cir. 2001).  A district court may determine that having before it the "demeanor evidence or the cross-examination of counsel that would have resulted from a full testimonial hearing . . . would not offer any reasonable chance of altering its view of the facts."  Id.  Thus, for example, where a defendant, who bears the burden of proving his claim, makes a "generic claim . . . based solely on his own self-serving and improbable assertions," it is not error for a district court to render a decision without a full-blown hearing.  Id.  This is because,

> [t]he trial judge is intimately familiar with the proceedings and the
> surrounding circumstances . .  and is [] in a position, based on the
> knowledge gained in the underlying criminal proceeding and on his []
> role as a trier of fact in the habeas proceeding, to hold that the
> particular petitioner had no chance of overcoming counsel's detailed
> explanation and proving that counsel prohibited testimony in his or
> her defense.

Puglisi v. United States, 586 F.3d 209, 215 (2d Cir. 2009).  In light of Bartok's self-serving statements – which are contradicted by the documentary evidence – and counsel's affidavit, Bartok's claims should be denied without a hearing.  See Chang v. United States, 250 F.3d 79, 86 (2d Cir. 2001) (affirming district court's denial of a Section 2255 motion where petitioner's claim that he was denied his right to testify was based on "his own highly self-serving and improbable assertions" and was contradicted by counsel"s "detailed description of events").

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that Bartok's motion be denied in its entirety without a hearing. This Court should not issue a certificate of appealability because there has been no "substantial showing of the denial of a constitutional right." 28 U.S.C. Section 2253(c)(2); see United States v. Perez, 129 F.3d 255, 260 (2d Cir. 1997). Further, this Court should order pursuant to 28 U.S.C. Section 1915(a)(3) that any appeal from an order denying Bartok's motion would not be taken in good faith. See Feliz v. United States, 2002 WL 1964347, at *7 (S.D.N.Y. 2002).

Dated: White Plains, New York
November 16, 2015

Respectfully submitted,
PREET BHARARA
United States Attorney

By: _____
John P. Collins, Jr.
Assistant United States Attorney
(914) 993-1919

24

**Certificate of Service**

I, John P. Collins, Jr., Assistant United States Attorney for the Southern District of New York, hereby certify that on November 16, 2015 I caused a copy of the foregoing

MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO ANDREW BARTOK'S MOTION TO SET ASIDE OR CORRECT HIS SENTENCE

to be served upon the following:

      1) By certified mail to Andrew Bartok, Register # 83500-054, FCI Loretto, P.O. Box 1000, Loretto, PA 15940.

Dated: White Plains, New York
      November 16, 2015

                                John P. Collins, Jr.
                                Assistant United States Attorney
                                (914) 993-1919